# EXHIBIT A

E-FILED
2/28/2023 4:28 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
23CV412466
Reviewed By: B. Roman-Antunez

JOSHUA HARRELL
54 N 5TH ST #10
SAN JOSÉ, CA 95112
650-334-9427
joshuaj1729@gmail.com

Self-Represented

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SANTA CLARA

23CV412466

| | |
|---|---|
| JOSHUA HARRELL, | Case No.: |
| Plaintiff, | **COMPLAINT FOR INJUCTIVE RELIEF AND DAMAGES** |
| v. | |
| CALIFORNIA STATE UNIVERSITY, | 1. **Conversion** |
| SAN JOSÉ STATE UNIVERSITY, | 2. **Deprivation of property without due process of law in violation of US Constitution, Amendment XIV, Section 1** |
| MELISSA SANCHEZ-ORTEGA, | 3. **Discrimination based on disability** |
| MIRYEM KHANAKA, | 4. **Retaliation against First Amendment protected activity** |
| NICOLE BRAVO, | 5. **Retaliation against opposition to illegal activity** |
| IGNACIA VILLAVELASQUEZ-HILL, | 6. **Wrongful use of administrative proceedings** |
| MIRABAI HUTTON, | 7. **Unlawful arrest by peace officer without warrant** |
| THOMAS F LEE, | 8. **Unreasonable search and seizure in violation of US Constitution, Amendment IV** |
| CHRISTOPHER ZONSIUS, | 9. **Failure to encourage education by suitable means (California Constitution Article IX, Section 1)** |
| PATRICK DAY, | 10. **Denial of right to attend safe, secure and peaceful campus (California Constitution, Article I, Section 28(f)(1)** |
| DOES 1-50, INCLUSIVE, | 11. **Denial of Equal Protection in violation of US Constitution, Amendment XIV, Section 1** |
| Defendants. | 12. **Breach of contract** |
| | 13. **Intentional Infliction of Emotional Distress** |
| | **JURY TRIAL DEMANDED** |

## I. **INTRODUCTION**

1.    Joshua Harrell was accepted as a transfer student to the Bachelor of Science in Biomedical Engineering program at San José State University (SJSU), enrolling in Fall 2021. Harrell is now enrolled in the Bachelor of Science in Interdisciplinary Engineering program at SJSU, with concentrations in Computer Engineering and Biomedical Engineering.

2.    Harrell's studies at SJSU and prior to SJSU have been marked with excellence and academic rigor. In Spring 2021 and Spring 2022, Harrell successfully passed 24 credits of college coursework in each semester, obtaining final grades of B or better in all credits. During Spring 2022, Harrell achieved an institutional GPA of 3.94 out of a possible 4.00. This is a measure of grade point average of all units taken at SJSU during Spring 2022.

3.    Harrell is a disabled student. Harrell is eligible for the accommodation of extended time on tests, and had received this accommodation at the Alternative Testing Center at IS 223.

4.    On April 20, 2022, Harrell took a midterm exam at the Alternative Testing Center. After the exam, defendants Sanchez-Ortega, Khanaka, and Bravo stole Harrell's testing notes, which Harrell needed for another midterm exam later that day. After Sanchez-Ortega asked Harrell to turn in the notes, Harrell handed the page of notes to Sanchez-Ortega and asked her to make a photocopy of the notes and instructed her to make a photocopy of the notes and return the original to Harrell. Instead, Sanchez-Ortega took the notes, but refused to either make a photocopy or return the page of notes to Harrell. Within a few minutes, defendants Khanaka and Bravo came to the Alternative

Testing Center and concurred with Sanchez-Ortega and rejected Harrell's requests to return the notes to Harrell.

5.      In attempting to justify their theft, defendants Sanchez-Ortega, Khanaka, and Bravo cited AEC policy that applies to disabled students who take tests with accommodations at the Alternative Testing Center, but does not apply to students who take tests normally, administered directly by professors. Harrell only obtained the notes back after the professor intervened at Harrell's request.

6.      Harrell met with defendant Villavelasquez-Hill, the AEC Director, at the earliest opportunity, from approximately 1:10 to 1:40 pm on April 28, 2022. During this meeting, Harrell expressed concern to Villavelasquez-Hill about the theft that Sanchez-Ortega, Khanaka, and Bravo had committed.

7.      Plaintiff is informed and thereupon believes that shortly after this meeting, at 2:52:49 pm on April 28, 2022, the San José State University Office of Student Conduct and Ethical Development (SCED) received an Incident Report. This Incident Report states that it was written by defendants Sanchez-Ortega, Khanaka, and Bravo, and submitted by Bravo.

8.      According to the Incident Report, Sanchez-Ortega, Khanaka, and Bravo each stated that Harrell had requested the notes back, but they refused to return the notes. Defendants alleged that Harrell "raised their voice" and was "loud" and "disrespectful" and "yelled" and "refused to listen". Apart from Khanaka's false and unsubstantiated allegation that Harrell's conduct was "aggressive", all Harrell's conduct that Sanchez-Ortega, Khanaka, and Bravo alleged was or would have been protected activity in the context of opposing discrimination.

9.      On May 5, 2022, defendant Hutton on behalf of SCED initiated a student conduct case against Harrell in response to the Incident Report. On May 23, 2022, defendant Hutton on behalf of SCED concluded this case by issuing a warning to Harrell. SCED did not offer a Hearing, thus violating SCED's own promise to allow Harrell to request a hearing to contest the warning.

10.     Like many SJSU students, Harrell struggles to find adequate places to study late at night, when most business establishments are closed. Fortunately, Harrell benefits from written SJSU policy, which allows students to continue studying in certain University buildings as long as they enter the buildings before certain times in the evening. This policy was a major factor that led to Harrell's previously mentioned academic success. This policy would have led to even greater academic success, if defendants had not ignored their own policy.

11.     Defendant SJSU has a policy of preventing students who are seeking a place to study from entering certain buildings after certain hours if they do not have specific authorization. However, University staff whose roles are only distantly related to education, such as event staff and athletic staff, are allowed to enter those same buildings at all days and times, whether or not they have any specific authorization. Harrell has always abided by this policy, even though this policy unfairly discriminates against students who are seeking a place to study, in violation of defendants' constitutional obligation to encourage education by all suitable means.

12.     On June 2, 2022, documentary evidence confirms that Harrell entered the Spartan Complex Central building on the SJSU campus by scanning their campus-issued Tower card student ID at an automated entry checkpoint, which unlocked the door for Harrell at 10:30 PM.

13.      On June 3, 2022, at around 12:47 AM, defendant Lee approached Harrell while Harrell was studying in the Spartan Complex Central building, and asked Harrell to leave the building, under the false pretense that the building was closed. Harrell pleaded that they had to continue to study and had nowhere else to do it. Lee ignored these pleas and told Harrell they could just study outside, where it was dark and approximately 59 degrees, and there were no outlets for charging devices.

14.     Then, Lee, along with defendant Zonsius, arrested Harrell, thus unreasonably seizing Harrell despite a lack of probable cause that any criminal activity had occurred.

15.     Lee and Zonsius conducted an unreasonable and excessive search of all Harrell's belongings. During this search, defendants damaged Harrell's backpack.

16.     Lee cited Harrell with a violation of Caifornia Penal Code 602(m), ignoring obvious exculpatory evidence that Harrell had not violated any law.

17.     Harrell had regularly studied in University buildings at night for at least the previous nine months. Lee knew that Harrell had been studying in University buildings at night at least in August 2021, and chose not to take action or warn Harrell. It was only on June 3, less than three weeks after Harrell filed to SJSU University Personnel a discrimination and retaliation complaint against defendants and their employees, that SJSUPD suddenly determined that Harrell's education was a threat to campus that needed to be punished.

18.     The same morning, on June 3, 2022, Harrell met with defendant Day, the Vice President of Student Affairs at San José State University. Harrell also met with Day on June 13, 2022 and September 23, 2022. Harrell complained that the officers' actions conflicted with University priorities, and asked to discuss options for late night study spaces for students on campus. Although Day seemed in the first two meetings to be interested in securing study spaces for students, in the third meeting this was no longer the case. In the third meeting, Day told Harrell that there was "no way to avoid accountability for your actions". Despite acknowledging Harrell's pleas about the educational necessity of such late night study spaces, Day responded that he did not see how this created an obligation for the University to provide such spaces.

19.     On June 6, 2022, defendant Hutton on behalf of SCED sent me a letter alleging that Harrell had violated Sections 2, 16, and 18 of the San José State University Student Code of Conduct. Both the University Police Department and SCED based their charges entirely on the Building Access page on the SJSU website, which lists "Student access operating hours" but does not prohibit Harrell's alleged activity of entering during the "student access operating hours" and remaining to continue studying after the end of the student access operating hours.

20.     On June 22, 2022, Harrell met again with defendant Hutton for a conference regarding the allegations from the June 6 letter. On July 1, defendant Hutton on behalf of SCED sent a proposed resolution agreement, in which SCED claimed to find me responsible for violating those three sections of the Student Code of Conduct. SCED proposed the sanctions of submission of a reflective paper, and one year of academic probation. SCED demanded a response by July 18, 2022, which was later extended multiple times until August 29, 2022.

21.     On August 30, 2022, Harrell sent by email and by certified mail a Notice of Claim for Tort to the AEC, accusing the AEC and its staff of committing theft, disability discrimination, and retaliation. USPS confirmed that this message was received on

22.     On August 30, 2022, Harrell sent by email and by certified mail a Notice of Claim for Tort to SCED, pleading Harrell's innocence in both cases and accusing SCED and its employees of disability discrimination, retaliation, violating the First and Fourteenth Amendments, violating a promise to seek late night study spaces for Harrell, and of violating multiple California State University (CSU) policies by breaking its own promise to offer Harrell a hearing, failing to complete the investigation in either case within promised timelines, failing to include a factual description of the student's alleged conduct that formed the basis of the charges for either case, failing to inform the student of the location on campus where they can view their discipline file, failing to inform Harrell which law or campus policy Harrell had allegedly violated, misapplying the principle of preponderance of evidence, and failing to send a Notice of Hearing within required timelines. USPS confirmed that this message was received on September 3, 2022, and SCED further acknowledged receipt later by acknowledging that the Notice of Claim for Tort was included in Harrell's student conduct file.

23.     None of the defendants ever responded substantially to either Notice of Claim for Tort. Instead, defendants made it clear that the only contact they wished to have with Harrell after September 23 was disciplinary proceedings.

24.     SCED proceeded to a Hearing on November 18, 2022, thus entirely ignoring the content of the Notice of Claim for Tort, and repeating many of the same offenses in the exact same form. SCED further violated CSU policy by failing to provide any notice to the student charged of the timeline extension, when the University waited 62 days after the Notice of Claim for Tort to inform Harrell that the University would proceed to a hearing. SCED Interim Director Staci Gunner's explanation for this delay conflicts with the facts.

25.     During the Hearing, Hearing Officer Victoria Sexton denied Harrell a fair hearing by denying Harrell the opportunity to cross examine the Student Conduct Administrator, defendant Hutton. Sexton permanently damaged her neutrality as a Hearing Officer by allowing defendant Hutton to assume an adjudicatory role, including by thanking Hutton "for guiding me through this because I do not live in [CSU Executive Order] 1098 at all like Mira does so she has a much vaster understanding". Sexton also failed to exercise discretion where required by law, due to her incorrect belief that she did not have such discretion.

26.     The Hearing Officer and defendants deprived Plaintiff of a fair hearing by failing to record the hearing in its entirety as required by CSU policy, and failing to timely and adequately explain the gap in the hearing recording.

27.     On December 7 and 8, 2022, Harrell made FERPA requests both by email and in person to Executive Assistant Teri Tanner at the Office of the Vice President of Student Affairs, requesting to inspect the Hearing Officer's report and review it for errors before defendant Day would make a final decision. Despite the fact that SJSU has promised to abide by FERPA, Tanner ignored these FERPA requests.

28.     On December 16, 2022, defendant Day informed Harrell that after reviewing the Hearing Officer's report, he had concluded that Harrell had violated Sections 2, 16, and 18 of the SJSU Student Code of Conduct. Day stated that he came to this decision after reviewing the Hearing Officer's report, which Harrell still has not been allowed to view.

In a cold denial of Harrell's FERPA rights, Day stated that the decision is final, and there is no further right of appeal.

29.    Defendants conspired together to commit conversion against Plaintiff. Defendants deprived Plaintiff of property without due process of law.

30.    Defendants conspired together at the highest levels to treat Plaintiff adversely based on Plaintiff's protected class of disability.

31.    Previously, on September 21, 2021, the United States Department of Justice (DOJ) placed SJSU on notice that its actions of protecting employees who violated students' civil rights, and retaliation against employees who reported misconduct, placed students in grave danger. Specifically, the DOJ found that SJSU retaliated against its employee Sage Hopkins in January and February 2020. The DOJ entered into an agreement with SJSU, in which the DOJ ordered SJSU not to retaliate against students or employees.

32.    Previously, defendants used shockingly similar tactics to retaliate against protected speech opposing civil rights violations. According to his pleadings in this court, on January 22, 2020, SJSU swim coach Sage Hopkins sent an email to his direct supervisor. In the email, Hopkins vented his frustrations with how SJSU had failed to respond to a mountain of allegations of sexual assault by a SJSU employee against SJSU students. Hopkins' supervisors responded by calling the email "hostile" and calling Hopkins a "safety threat". One of the SJSU employees involved in this retaliation was Julie Paisant, who wrote to Harrell on June 7, 2022, "The AEC staff alleged perceiving your conduct as threatening, thus prompting them to file a complaint."

33.    Harrell sent a report of discrimination and retaliation to SJSU University Personnel on May 15, 2022. Paisant responded on June 7, "There is insufficient facts to warrant a formal invistigation [sic] into a discrimination claim. [. . .] there are insufficient facts to warrant a formal investigation into the retaliation claim." However, Paisant did investigate unfounded claims filed between March and April 2016 against Jason Laker, an SJSU professor who had recently opposed sexual and racial harassment allegedly

perpetrated by a different SJSU professor. In successfully contending that the investigations against Laker did not constitute retaliation, Paisant stated, "[t]he threshold for investigation under Executive Order 1096 is intentionally low because it would be unfair to summarily dismiss an adequately described complaint without at least some probe into the merits of the complaint." (Laker v. Board of Trustees of California State University (2019) 32 Cal. App. 5th 745) Evidently Paisant believes

34.    These scandals affected SJSU at the highest levels. On October 7, 2021, the President of SJSU resigned amid allegations that she had failed to respond when this conduct was brought to her attention.

35.    CSU, at the highest levels, has a recent history of protecting and rewarding faculty members who violate students' civil rights. On February 17, 2022, CSU Chancellor Joseph Castro resigned after a USA Today investigation revealed that while Castro was President of CSU Fresno (another campus of CSU on equivalent standing with SJSU), Castro had failed to adequately respond to several allegations that a CSU Fresno faculty member had engaged in sexual harassment, bullying, and retaliation. Instead, after an outside law firm retained by CSU found the faculty member responsible for sexual harassment, Castro chose to pay the faculty member $260,000 to leave CSU, and wrote the faculty member a letter of recommendation, rather than subjecting the faculty member to disciplinary action as CSU's own policies required. Instead of attempting to expel Castro from CSU, CSU allowed Castro to become a tenured professor at its San Luis Obispo campus.

36.    Despite these previous warnings, defendants have maintained an environment that protects employees who violate students' civil rights, while defendants have weaponized SCED to retaliate against students who report such misconduct.

37.    Defendants ignored their constitutional obligations to encourage education by attempting to enforce unwritten policies that discouraged students' education, by ignoring Plaintiff's defenses that Plaintiff's actions were necessary for Plaintiff's education and did not cause any greater harm, and by maintaining written building access policy that

discriminates against students who need a place to study in favor of staff who are only distantly related to education. Defendants have not provided any justifications for why they believe that opposite actions to encourage education would not have been suitable means.

38.     Defendants have denied Plaintiff equal protection of the law by punishing and arbitrarily discriminating against Plaintiff based on unwritten policy, without basing their charges on any written policy that applies equally to all people of Plaintiff's standing.

39.     Defendants have breached their contractual obligations by failing to follow their own student conduct policies. Most of these policies were enacted before Plaintiff became a student at SJSU. Plaintiff thus made a decision to enroll at SJSU with the understanding that defendants would follow these policies.

40.     Defendants have violated federal law by rejecting a request from Plaintiff to provide Plaintiff, an adult student, with access to their own educational records, and by denying Plaintiff a hearing to challenge the content of their educational records.

41.     Defendants have intentionally and negligently inflicted emotional distress on Plaintiff, and engaged in oppression and despicable conduct against Plaintiff, by acting in conscious and reckless disregard for Plaintiff's rights and ignoring Plaintiff's pleas for relief. This emotional distress has caused Harrell, a previously high achieving student, to suffer a downturn in academic performance.

42.     At every stage, when Plaintiff has provided defendants notice of how defendants had violated the law, defendants have coldly ignored this notice and have continued to violate the law. At every stage, Plaintiff has engaged in good faith with defendants in an effort to reconcile Plaintiff's differences with defendants. Defendants' refusal to answer for their actions informally to Plaintiff makes it necessary that they must answer for their actions to this Court.

43.     Defendants must be held accountable, not only to satisfy the demands of justice, but just as importantly to affirm the rights of students, and to discourage such flagrantly irresponsible actions and/or inactions from being perpetrated on students in the future.

## II. JURISDICTION AND VENUE

44.     The Court has jurisdiction over this matter, and venue is proper, because all relevant acts and omissions occurred within the State of California and the County of Santa Clara. Plaintiff Joshua Harrell is a resident of Santa Clara County. Defendant SJSU is a campus of defendant CSU. SJSU's main campus is in the City of San José, Santa Clara County. Plaintiff is informed and believes that all individual defendants are employees of SJSU, and that their primary workplace is at SJSU's campus in Santa Clara County.

## III. CONDITIONS PRECEDENT TO FILING ACTION

45.      Harrell has complied with all required conditions precedent prior to filing this action. Harrell has complied with all pre-lawsuit filing requirements, including, but not limited to, the following administrative exhaustion events:

a.      On May 15, 2022, Harrell sent a discrimination and retaliation report to San José State University Office of University Personnel. On June 7, University Personnel responded that they had found insufficient evidence to warrant a complete investigation. However, the message did not answer the crucial question of whether AEC staff had committed theft.

b.      Plaintiff timely sent a Notice of Claim for Tort to SCED in accordance with Government Code §900-915.4 and §945. Plaintiff sent this on August 30, 2022 by USPS certified mail. USPS confirms that the message was delivered on September 3, 2022. Additionally, SCED confirmed that the document was received by including it in my student conduct file. SCED Interim Director Staci Gunner confirmed in writing that the document was part of the administrative record, and confirmed that it "has been received and forwarded to the appropriate parties". However, none of the defendants ever substantially responded to this Notice of Claim for Tort.

c.      Plaintiff timely sent a Notice of Claim for Tort to the AEC in accordance with Government Code §900-915.4 and §945. After USPS failed to confirm

delivery after Plaintiff's first attempt at service, Plaintiff sent this Notice of Claim for Tort by USPS certified mail on October 15, 2022. USPS confirms that the message was delivered on October 25, 2022. However, none of the defendants ever substantially responded to this Notice of Claim for Tort.

d.      Plaintiff cooperated with the student conduct case that SCED initiated against Plaintiff on May 5, 2022. This case apparently ended when defendant Hutton on behalf of SCED sent plaintiff a letter that alleged "possible violations of the Student Conduct Code" and said, "Following an investigation of the stated allegations, Joshua Harrell is receiving a warning is the appropriate outcome [. . .]". This letter did not offer Harrell the opportunity to contest this warning in a hearing.

e.      Plaintiff cooperated with the student conduct case that SCED initiated against plaintiff on June 6, 2022. This case apparently ended on December 16, 2022 when defendant Day wrote to Harrell that Harrell had been found responsible for violating Sections 2, 16, and 18 of the Student Code of Conduct, and informed Harrell that Day was imposing a warning on Harrell. The letter states, "This decision is final; there is no further right of appeal."

**IV. <u>STATUTE OF LIMITATIONS</u>**

46.    Plaintiff believes that Plaintiff has brought this claim, along with the previous Notices of Claim for Tort, within the timelines normally prescribed by law.

47.    Recipients AEC and SCED were properly named recipients for the Notices of Claim for Tort. AEC and SCED are both local public entities as defined in Government Code §900.4, and both are substituent parts of California State University. Plaintiff provided recipients with notice as prescribed in Government Code §905 and §905.9.

48.    Defendants are estopped from bringing any challenge to the adequacy of the Notices of Claim for Tort due to their failure to respond to the Notices of Claim for Tort. (Government Code §910.8 and §911)

49.     Defendants are estopped from bringing any challenge to the lateness of this claim due to their failure to respond to the Notices of Claim for Tort. (Government Code §911.3)

50.     Defendants are estopped from bringing any challenge to the lateness of this claim because any delays in presenting this claim were not caused by Plaintiff, but were caused by defendants' own previous and ongoing conduct violating legal and contractual obligations to inform Plaintiff of how to access records and to allow Plaintiff to inspect records, some of which were necessary for Plaintiff to prepare this claim.

## V.    **PARTIES**

51.     Plaintiff Joshua Harrell is a natural person who at all times mentioned in the complaint has been an adult resident of Santa Clara County and a student at SJSU.

52.     Defendant California State University (CSU) is the Board of Trustees of the California University, the government entity that oversees the largest institution of higher education in California. The San José State University Police Department (SJSUPD) directly responds to CSU under Education Code §89560.

53.     Defendant San José State University (SJSU) is a campus of CSU, located in the City of San José, Santa Clara County, California. Offices at SJSU include the Accessible Education Center (AEC), the Office of Student Conduct and Ethical Development (SCED), and the Vice President of Student Affairs (VPSA).

54.     Plaintiff is informed and believes that during the times mentioned in this claim, defendant Melissa Sanchez-Ortega was a natural person employed by CSU, SJSU, and AEC as a Testing Accommodations Support Analyst.

55.     Plaintiff is informed and believes that during the times mentioned in this claim, defendant Miryem Khanaka was a natural person employed by CSU, SJSU, and AEC as a Services & Accommodations Support Specialist.

56.     Plaintiff is informed and believes that during the times mentioned in this claim, defendant Nicole Bravo was a natural person employed by CSU, SJSU, and AEC as an Accommodations Counselor/Coordinator.

57.    Plaintiff is informed and believes that during the times mentioned in this claim, defendant Ignacia Villavelasquez-Hill was a natural person employed by CSU, SJSU, and AEC as the Interim Director of the Accessible Education Center.

58.    Plaintiff is informed and believes that during the times mentioned in this claim, defendant Mirabai Hutton was a natural person employed by CSU, SJSU, and SCED as a the Associate Director of the Office of Student Conduct and Ethical Development. Hutton acted in the role of Student Conduct Administrator during both student conduct cases against plaintiff.

59.    Plaintiff is informed and believes that during the times mentioned in this claim, defendant Thomas F Lee was a natural person employed by CSU and SJSUPD as a peace officer, with badge number #1014.

60.    Plaintiff is informed and believes that during the times mentioned in this claim, defendant Christopher Zonsius was a natural person employed by CSU and SJSUPD as a peace officer, with badge number #1022 and the rank of Sergeant.

61.    Plaintiff believes that because Plaintiff is currently charged with a criminal offense arising from defendants' report of this encounter, defendants Lee and Zonsius are protected by Government Code § 945.3 from civil action for money or damages while the charges are pending before the superior court. After the superior court concludes its review of the criminal case, Plaintiff will request leave of this court to amend this complaint to include state claims for tort against defendants Lee and Zonsius. However, Plaintiff now raises complaints under 42 U.S. Code § 1983 that are not similarly barred while criminal charges are pending.

62.    Plaintiff is informed and believes that during the times mentioned in this claim, defendant Patrick Day was a natural person employed by CSU and SJSU as the Vice President of Student Affairs of San José State University. Plaintiff is informed and believes that the Interim President of SJSU, Steve Perez, delegated various responsibilities to Day. These responsibilities include issuing the final decision in student

conduct cases that proceed to a hearing. Day acted under the color of this authority in Harrell's student conduct case on December 16, 2022.

63.     Plaintiff believes that DOES 1-50 inclusive are individual defendants who acted in concert with the forenamed defendants to commit the torts mentioned in this complaint. Plaintiff does not know the real names of these defendants, so Plaintiff refers to them using these fictitious names. Whenever Plaintiff learns their real names, Plaintiff will request leave of this Court to amend this complaint to insert their real names.

## VI. FACTUAL BACKGROUND

### Harrell Models Resilience and Academic Rigor

64.     Joshua Harrell has faced difficult life conditions while living in California throughout the pandemic, including poverty, homelessness, lack of food security, and lack of job security.

65.     These conditions motivated Harrell to seek a better life through California's public education system, both in California Community Colleges and SJSU. Harrell dreamed of a future in which they would build cutting-edge tools in the health care field, to improve quality of life and save lives. Harrell saw a public education as the quickest way to achieve these goals, and Harrell set out to earn an undergraduate degree as quickly as possible.

66.     On March 10, 2021, SJSU accepted Harrell as a transfer student to its Bachelor of Science in Biomedical Engineering program.

67.     Transfer applicants to the CSU system typically complete a minimum of 60 semester credits outside CSU prior to enrolling at CSU. This is considered equivalent to two years of full time college education. Harrell completed 65 semester credits outside SJSU before enrolling at SJSU.

68.     In many recent initiatives, CSU has focused on its two year transfer graduation rates, with the logic that a student who has completed two years of college studies should only require two additional years to obtain a four year degree. Of course, many obstacles

still remain, including the lack of adequate preparation of many incoming transfer students.

69.     Immediately after being accepted, Harrell sought academic advising from the chair of the SJSU Department of Biomedical Engineering and from the SJSU Engineering Student Success Center, in order to develop a graduation plan. Harrell subsequently learned that Harrell was inadequately prepared to graduate two years after transferring, and Harrell would be unable to graduate with a Biomedical Engineering degree until three years later in Spring 2024.

70.     Being unsatisfied with this extended timeline, Harrell immediately sought to change their major to Interdisciplinary Engineering, in order to develop a plan to graduate with a bachelor's degree a full year sooner: two years after transfer, in Spring 2023.

71.     On or shortly before February 16, 2022, Harrell's request to change major to Bachelor of Science in Interdisciplinary Engineering, with concentrations in Computer Engineering and Biomedical Engineering, was approved.

72.     This new pathway was never destined to be easy. SJSU's Office of Institutional Effectiveness and Strategic Analytics publishes statistics on graduation rates for various majors. Statistics aggregated from this source reveal that from Fall 2009 to Fall 2020, 76 students were accepted as undergraduate transfer students into SJSU's Interdisciplinary Engineering major or its preceding major, General Engineering. Only one of them graduated within two years. This means that the two year undergraduate transfer graduation rate for General/Interdisciplinary Engineering is 1.32 percent.

73.     Harrell was undeterred by these apparent challenges. Harrell studied at a pace as high as 24 credits per semester, and also took classes in every summer and winter intersession. In the months from September 2020 to July 2022 inclusive, Harrell completed 107.5 semester credits. At a normal pace of 30 credits per year, this load would be completed in 3 years and 7 months. Harrell completed this load in under 1 year 11 months.

74.     Harrell is a disabled student. Rather than concede to the massive obstacles they faced, Harrell instead chose to draw from all their human strengths and weaknesses to form themselves into a successful student.

75.     Harrell is a Pell Grant recipient. The Pell Grant is a federal grant for students of very low income. Thus, CSU and SJSU use the Pell Grant recipient characteristic as a proxy for the wealth of students. Such students are eligible for thousands of dollars in free money from the state and federal government to finance our educations. CSU has recognized that despite this support, Pell Grant recipients still face significant economic obstacles, and are less likely to graduate on time than our peers. CSU and SJSU have stated their objectives of reducing the Pell Grant graduation gap to zero.

76.

**Defendants Refused to Return Harrell's Notes upon Harrell's Request, Citing AEC Policy**

77.     On August 18, 2021, The San José State University Accessible Education Center (AEC) sent Harrell previously acknowledged in accordance with relevant law that Harrell was eligible for Extended Time 1.5x accommodation: "Prescribed extended time to be provided for all curriculum assessments scheduled to be taken during a specific period of time". Since logistical constraints may prevent students from being able to receive such extended time during their normal class periods, the AEC's primary method for administering this accommodation has been by allowing students to book a time slot at the Alternative Testing Center at IS 223.

78.     During the Spring 2022 semester, Harrell was enrolled in BME 115 Foundations of Biomedical Engineering at SJSU with Professor Patrick Jurney.

79.     Harrell discussed with Jurney the options for the second midterm examination, and Harrell decided that the best way would be to take the exam at the Alternative Testing Center on April 20, 2022, starting at 8:30 AM. Harrell scheduled this time slot with AEC.

80.     Harrell's intense course load inevitably results in situations that other students might consider extreme. On April 20, 2022, Harrell took four midterm examinations in one day, all with 1.5x extended time, listed in chronological order: BME 115 Foundations of Biomedical Engineering, CMPE 30 Programming Concepts and Methodology, BME 177 Physiology for Engineers at SJSU, and PHYS 004B General Physics at San José City College (SJCC).

81.     This course load required Harrell to combine preparation for multiple classes, taking advantage of situations when separate classes teach the same concepts. In preparation for this day, Harrell prepared a single handwritten page of public domain physics and engineering formulas. Recognizing that these formulas were relevant to both the BME 115 and PHYS 004B examinations, Harrell intended to use this page of notes for both exams.

82.     Harrell correctly calculated that this plan should have yielded success. Harrell believes that neither of the two professors effectively informed Harrell that Harrell would be required to turn in the notes after the exam. Harrell reviewed the written course materials for BME 115 and believes that no such notice was made in writing. Harrell does not recall that any oral notice was provided. Even if Harrell were incorrect in these beliefs and recollections, these facts would not threaten any of the core elements for a cause of action of conversion.

83.     At about 8:20 AM on April 20, 2022, Harrell checked in with Sanchez-Ortega. Harrell placed all of their other belongings in a locker and checked their watch, their calculator, and their single page of handwritten notes with Melissa, before they brought these permitted items with them into the examination room.

84.     After Harrell finished their exam, at about 10:20 AM, Harrell returned to the reception desk and returned their exam to Sanchez-Ortega.

85.     Sanchez-Ortega told Harrell that she would also need the page of notes from Harrell. Harrell told Sanchez-Ortega that Harrell could not turn in the page of notes,

because Harrell had a physics midterm later that day, and some of the notes on that page were notes for Harrell's physics exam, and they did not have an additional copy.

86.    Sanchez-Ortega responded that Professor Jurney had checked a box on the exam form that stipulated that the exam notes must be turned in after the exam.

87.    Harrell then handed the page of notes to Sanchez-Ortega, saying, "Then you can take a photocopy of the notes and give me the original back."

88.    Sanchez-Ortega took the page of notes, and responded that she could not take a photocopy of the notes without the permission of the instructor.

89.    Harrell then asked Sanchez-Ortega to give the page of notes back to them. Sanchez-Ortega responded that she could not do this, because it is AEC policy to retain the notes from a student when the professor requests the notes. Sanchez-Ortega attempted to contact the professor by phone, but the AEC was unsuccessful in its attempts to contact the professor during the duration of Harrell's visit to the AEC testing center.

90.    Defendants Khanaka and Bravo also came, and Harrell had the same conversation with each of them, in which Harrell explained that they understood that there could be academic sanctions for failing to turn in their notes, and their plan was to take a picture of their notes as soon as they received them back and to send the picture to their professor, and explain that they needed their notes back for a midterm later that day and the AEC was unwilling to take a photocopy of their notes. If, despite this, the professor still chose to initiate academic proceedings, that was a risk they were willing to take. Harrell informed defendants that the page of notes was Harrell's personal property, and that if defendants chose not to give it back, this would be theft.

91.    Khanaka and Bravo did not acknowledge or contest that the page of notes was Harrell's personal property, or that their actions were theft, but repeated that it was AEC policy to retain the notes when a professor requested this.

92.    Bravo told Harrell that Harrell could file a report if they were concerned. Harrell responded that a report was not good enough, because reports typically take weeks to process, and Harrell needed their notes today. Harrell told Bravo that since this was theft,

I was also able to file a theft report with the police. Bravo acknowledged this, and Harrell left.

93.    After Harrell left the AEC testing office, Harrell went directly to Professor Jurney's office. Fortunately, he was there. Harrell explained the situation to him, and he agreed to go with them to the AEC office to retrieve their page of notes. Harrell and Jurney went, and Harrell received their page of notes back immediately after Professor Jurney left the AEC testing office.

94.    Defendants' illegal actions significantly harmed Harrell. On a day when Harrell took four midterm examinations, all with extended time, Harrell only had enough time between examinations to eat and briefly review the content of the next midterm. Defendant's illegal actions seriously damaged Harrell's focus and rhythm. Since defendant's illegal actions wasted about half an hour of Harrell's time in attempting to retrieve the notes, Harrell had significantly less time to review for the following CMPE 30 midterm examination. While taking the remaining examinations, Harrell found it extremely difficult to focus on the previous examinations, because Harrell was instead committing significant mental and emotional resources to being alert to the clearly substantiated fear that University staff would sabotage Harrell's examinations, just as AEC staff had violated Harrell's basic rights that morning. As a result, on both of the remaining two exams Harrell took on the SJSU campus on April 20, Harrell underperformed their first midterm score for that class.

95.    Harrell went to the AEC office the next day, April 21. Defendant Villavelasquez-Hill arrived at the desk, and Harrell requested to schedule a meeting with the director. Villavelasquez-Hill pointed Harrell to the website where they could schedule a meeting with her. Harrell scheduled a meeting with Villavelasquez-Hill for the next Tuesday, April 26.

96.    On Tuesday, April 26, Randy Rodriguez, an uninvolved worker at the AEC, showed up on the call instead of Villavelasquez-Hill, and explained that Villavelasquez-Hill had other things come up. Harrell discussed unrelated matters with Rodriguez during

the call, but they explained that they really wanted to meet with Villavelasquez-Hill because they had grievances with the AEC. Harrell explained to Rodriguez that although Harrell understood that they had pathways for complaints outside the AEC, the only way their concerns could be appropriately resolved within the AEC would be with the director. Rodriguez apologized and asked Harrell to schedule another meeting with Villavelasquez-Hill on the AEC website, and told them that he would communicate with Villavelasquez-Hill to let her know that their meeting was important.

97.     At 1:26 pm on April 26, Harrell scheduled a meeting with Villavelasquez-Hill, and included the following comment along with the appointment: "Testing concerns: block scheduling policy, photocopying, communication, theft. These concerns are for Ignacia specifically because they involve a grievance against the AEC. I appreciated meeting with Randy on Tuesday, but if Ignacia cannot attend this meeting, you can cancel the meeting and reach out to me to reschedule."

98.     On April 27 at 3:51 PM, only after Bravo presumably learned that Harrell still intended to seek redress for their grievances against Bravo and her colleagues, Bravo sent Harrell an email that hinted to Harrell's protected conduct, in an effort to deflect from Bravo's own illegal conduct: "Hi Joshua, I hope you are well. I am reaching out to follow up about a conversation you and I had last Wednesday (4/20) in AEC's Testing Center. You and I discussed your concerns regarding your BME 115.001 exam notes after other AEC staff members explained that AEC must have instructor permission to allow students to keep exam notes. I know this situation was frustrating for you, and I would like to talk about how we can work together to create a clear and effective method of communication moving forward. My goal is to find ways to minimize stress and confusion in the future so you feel comfortable testing with us. I would also like to talk about guidelines for interacting with AEC staff so we can all have a positive and respectful experience with each other."

99.     Harrell met with Villavelasquez-Hill on Thursday, April 28 from approximately 1:10 to 1:40 pm.

100.    Villavelasquez-Hill confirmed that the AEC has a checkbox in the Alternative Exam Instruction Form that instructors fill out that asks them whether they want to allow photocopies, and confirmed that in this instance the professor had checked the box to prohibit photocopies of notes. However, when Harrell requested to view a copy of the Alternative Exam Instruction Form, Villavelasquez-Hill denied this request. However, on June 7, University Personnel sent Harrell a redacted copy of the Alternative Exam Instruction Form form that Professor Jurney had filled out for this exam. The form contains no such checkbox question regarding photocopies, and Professor Jurney had not specially requested in the form to prohibit AEC Staff members from photocopying the notes. The AEC policy manual includes no such policy. This suggests that Villavelasquez-Hill may have lied that this policy existed, in an effort to double down on defendants' illogical and unnecessary refusal to photocopy Harrell's notes.

101.    Harrell asked Villavelasquez-Hill if the AEC could make a policy of telling the students at check in before the exam begins, if they check notes in, and if the professor has a policy of requiring notes to be turned in, that they will have to turn in those notes at the end of the exam. Harrell noted that this would make it easier for them this time, since then they could have just gone to the photocopying station in that building and made a photocopy and had enough time to return before the exam start time. Villavelasquez-Hill responded that the AEC just did not consider this a priority.

102.    Harrell expressed their concerns to Villavelasquez-Hill over the lack of engagement from AEC employees on the question of whether the notes were Harrell's personal property. Villavelasquez-Hill acknowledged that the notes were Harrell's personal property.

103.    Harrell asked Villavelasquez-Hill about Bravo's statement from the previous day: "AEC must have instructor permission to allow students to keep exam notes." Harrell asked Villavelasquez-Hill if this is an AEC policy that applies even if the notes are the student's personal property, and the student requests the notes back. Villavelasquez-Hill confirmed that the policy still applies in this instance. Harrell informed Villavelasquez

that this meant that the AEC had a policy that required theft, and that this policy must be reformed.

104.    Villavelasquez-Hill instead deflected to tell Harrell that it was Harrell's responsibility to ask professors their exam policies at the beginning of the semester, and to abide by these policies. This was an attempt to sidestep the responsibility of the professor and the AEC to give the student advance notice that they would require the student to turn in notes, and to follow the law with respect to personal property.

105.    Harrell also referenced Bravo's deflection to "guidelines for interacting with AEC staff". Harrell informed Villavelasquez-Hill that if AEC staff did not want to see Harrell upset, they must not commit crimes against Harrell.

106.    Defendants' actions make it much more difficult for Harrell to receive Harrell's accommodations. Harrell is justified in not wishing to return to the AEC Alternative Testing Center, knowing that their personal property will not be respected if they return. Instead, Harrell has been forced to arrange with professors for alternative means to grant Harrell's 1.5x time accommodation. These alternative means have sometimes been inferior to the environment that the AEC advertises for its Alternative Testing Center.

107.    For students who are not disabled, the equivalent arrangement to AEC's Alternative Testing Center is to take the examinations in class, directly administered by the professor. Due to the absence of evidence to the contrary, Harrell believes that SJSU professors, including Professor Jurney, always follow the law with respect to students' personal property when professors directly administer exams, and always return a student's personal property upon a student's request. Harrell has only ever observed Professor Jurney to follow the law. After reviewing the Alternative Testing Instruction Form that Professor Jurney submitted with his instructions, Harrell believes that Professor Jurney did not ask AEC staff to reject a potential request from a student to return their personal property, and Professor Jurney did not ask AEC staff to violate the law in any way.

**Defendants Responded to Harrell's Good Faith Opposition to Discrimination by**

**Seeking Student Conduct Sanctions Against Harrell**

108.    On November 22 and 29, 2022, Harrell visited the SCED office to perform a review of their file. Harrell found in that file an Incident Report dated April 28, 2022 at 2:52:49 pm, roughly 72 minutes after Harrell's meeting with Villavelasquez-Hill. The Incident Report claims to be submitted by defendant Bravo, and claims that statements therein were written by defendants Sanchez-Ortega and Khanaka. Defendants will need to affirm or deny the legitimacy and true authors of this document to this Court in response to requests for admission and production.

109.    Although CSU's own policy in Executive Order 1098 (III)(B)(2)(d) required SCED to inform Harrell on May 5, 2022 of how they could view this document, defendants' violation of their own records access policies meant that Harrell was not aware of the existence of this Incident Report until November 22, 2022.

110.    According to the April 28 Incident Report, defendants Sanchez-Ortega, Khanaka, and Bravo all confirmed that Harrell requested their notes back. Bravo further confirms that Harrell said that the notes were Harrell's personal property. Khanaka further confirms why Harrell requested the notes back, writing that Harrell informed Bravo that they needed the notes for another midterm they had later that day. Khanaka confirms that Harrell told her that she was not considering Harrell's hard work and time spent on the notes.

111.    According to the April 28 Incident Report, defendants Sanchez-Ortega, Khanaka, and Bravo each confirmed individually that they had refused to return Harrell's notes upon Harrell's request.

112.    According to the April 28 Incident Report, defendants Sanchez-Ortega, Khanaka, and Bravo each cited AEC policy as the reason they had refused to return Harrell's notes upon Harrell's request.

113.    According to the April 28 Incident Report, Sanchez-Ortega alleged that Harrell "raised their voice" and was "loud" and "disrespectful". Khanaka alleged that Harrell

"become more and more upset and start talking in a very loud and argumentative manner" and "yelled" and "refused to listen".

    a.       Harrell objects to the loaded language of these allegations. During this encounter, Harrell used a controlled tone of voice and controlled nonverbal expressions to urgently communicate that defendants were violating the law, and that this violation of law had a potential to create immediate and irreparable harm. Calm and muted expressions could not have communicated this.

    b.       CSU requires all its employees to complete CSU's Discrimination Harassment Prevention Program. Plaintiff believes that this training program educates employees on CSU's policy on Discrimination and Retaliation in CSU Executive Orders 1095, 1096, and 1097. Thus, defendants should have known that their actions constituted discrimination on the basis of disability, as defined by CSU Nondiscrimination Policy (VII)(A)(1). Defendants should have known that even if true, all these allegations would have been protected behavior, because Plaintiff was opposing and reporting conduct which was reasonably and in good faith believed to be in violation of that Nondiscrimination Policy. Defendants should have known that their adverse activities of filing a report to SCED on this basis would have constituted retaliation as defined in CSU Nondiscrimination Policy (VII)(A)(9)(b). Moreover, defendants had a duty to promptly report the discrimination and retaliation committed by their colleagues, according to CSU Nondiscrimination Policy (V)(A).

    c.       Even if true, all of these allegations would be natural and acceptable responses from someone who realizes that a crime has been committed against them, causing them great harm.

114.    According to the Investigation Report, Defendant Khanaka alleged that Harrell's conduct was "aggressive". This claim is false. This claim is not corroborated by either of Khanaka's colleagues who were present and also submitted statements, according to this report. This claim is not accompanied by any allegations of words or conduct that might

be objectively considered aggressive. At most, this allegation is supported only by Khanaka's perceptions that Harrell spoke and acted with aggressive intent. The more obvious explanation is that Harrell spoke and acted out of a desire for legal justice, which Khanaka and her colleagues had denied.

115.    According to the Incident Report, defendant Sanchez-Ortega claimed that Harrell "did not want to leave after being told to". Harrell does not recall that AEC staff asked them to leave the room, and believes that AEC staff never asked them to leave the room. Even if AEC staff had asked Harrell to leave the room, this request would have been an attempt to deprive Harrell of their personal property, and thus this request most likely would have been illegal. Given the circumstances, it was acceptable for Harrell to remain in the room to object to the theft of their personal property.

116.    According to the Incident Report, defendants accused Harrell of preventing other students from accessing the front desk of the Alternative Testing Center in order to turn in their tests. Harrell was focusing on their interactions with the AEC staff. Harrell was not fully aware of their surroundings, and they were not aware that there were other students waiting to turn in their exams. Harrell believes that the staff never informed them of this and never asked them to move to the side to allow them to attend to another student.

117.    Harrell doubts whether any harm resulted, because the Incident Report notes that one of the AEC staff members stepped aside to assist the other students, while Harrell was still engaging with the other AEC staff.

118.    On May 5, 2022, Defendant Hutton on behalf of SCED sent Harrell a Notice of Conference regarding violations of Sections 4, 6, and 17 of the Student Code of Conduct.

119.    This letter contained threatening language, noting, "Should you be found responsible, sanctions may include [. . .] suspension; and/or expulsion."

120.    The letter contained the following description of conduct: "It was reported to our office that on or about the morning of April 20th, an incident occurred in the AEC

Testing Center that disrupted staff's ability to do their jobs. You were reportedly involved in that incident."

121.    The letter continued, "A review of the information suggests that the following sections of the Student Code of Conduct may have been violated: • (4) Participating in an activity that substantially and materially disrupts the normal operations of the University, or infringes on the rights of members of the University community. • (6) Disorderly, lewd, indecent, or obscene behavior at a University related activity, or directed toward a member of the University community. • (17) Failure to comply with directions, or interference with, any University official or any public safety officer while acting in the performance of his/her duties

122.    The letter promised, "Should the SCA determine there is a violation, a Proposed Resolution Agreement will be sent. A Proposed Resolution Agreement is a detailed letter that provides notice of the policy violation(s) and the opportunity to accept the recommended sanctions or to request a Hearing."

123.    The letter requested that Harrell schedule an appointment with SCED. Harrell scheduled an appointment the same day and Harrell met with Defendant Hutton on Friday, May 13. Harrell first asked Defendant Hutton to elaborate on the allegations.

124.    Defendant Hutton explained that the report said that Harrell had prevented other students from accessing the reception desk to turn in their tests, thus violating Section 4 of the Student Code of Conduct.

125.    Defendant Hutton explained that the report said that Harrell had raised their voice and become upset, agitated, and argumentative, thus violating the "disorderly" portion of Section 6 of the Student Code of Conduct.

126.    Defendant Hutton explained that the report said that Harrell had failed to comply with directions from AEC staff to leave the testing center, and to leave their notes behind, thus violating Section 17 of the Student Code of Conduct.

127.    Harrell told Associate Director Hutton the details of what happened on April 20, as described in this claim. Harrell asserted that they had not violated the Student Code of Conduct.

128.    In response to the Section 4 allegations, Harrell responded with the defenses shared in Fact 116 of this claim. Harrell also pointed out that the actions of the AEC staff substantially and materially disrupted the normal operations of the University, and infringed on the rights of members of the University community. Thus, the motivation of Harrell's actions was the opposite of a violation of Section 4; they attempted to resolve or mitigate the impact of such actions.

129.    Harrell responded to the Section 6 allegations by asserting to Defendant Hutton that Harrell had not behaved in a disorderly way. Harrell said to Hutton that Harrell had not raised their voice. Although Harrell acknowledged that they were upset, they objected to the words agitated and argumentative because of the misleading connotations that these words contain. Harrell shared their concern that agitated and argumentative contain the connotations that they were out of control and that their claims were unreasonable, which loses the larger context of how Harrell was asserting their rights after the staff committed a crime against them, and how Harrell had a very good reason for all of their words and actions.

130.    Harrell responded to the Section 17 allegations by conveying two sufficient defenses to Defendant Hutton. The first affirmative defense was that the university officials were not acting in the performance of their duties, but they were acting in the performance of crime. The second sufficient defense was that for both of the specific Section 17 allegations, Harrell did not actually fail to comply with a direction from a University official. In response to the first specific allegation, no University employee ever asked Harrell to leave the testing center. Harrell left of their own accord after they realized that they would not be able to gain anything from further negotiation. In response to the second specific allegation, after Harrell handed their page of notes to Sanchez-Ortega at the beginning of the encounter, and Sanchez-Ortega took the notes,

Harrell's notes were in the physical possession of the AEC for the remainder of the encounter. Harrell did not reject a direction to leave their notes behind.

131.    Hutton conceded that she did not see evidence that Harrell had violated Section 17, and promised to talk with AEC staff to determine whether Harrell had violated Sections 4 and 6.

132.    However, Harrell's SCED discipline file shows no record that Hutton ever talked with AEC staff as part of her investigation. There were only three documents SCED produced showed Harrell in response to Harrell's request to inspect on November 22, 2022 all documents relating to this case:

    a.      The Incident Report mentioned in Fact 108 et seq,

    b.      The May 5 letter mentioned in Fact 118 et seq, and

    c.      The May 23 letter mentioned in Fact 133 et seq.

133.    On May 23, 2022, Defendant Hutton on behalf of SCED sent Harrell a letter stating that Harrell was issued a warning. The letter contained the same conduct description mentioned in Fact 120, and continued, "The behavior listed above was considered as possible violations" of Sections 4 and 6 of the Student Code of Conduct.

134.    The letter then seems to imply that the charges mentioned are more than just "possible violations", continuing, "Additional violation(s) of the Student Conduct Code may result in further discipline as described in California State University Executive Order 1098."

**Defendants Arrested and Cited Harrell for Trespassing, After Harrell Was Studying and not Trespassing**

135.    Harrell struggles from an issue that disproportionately affects poorer students and Pell Grant recipients: Harrell lacks an adequate place to study at night off campus.

136.    In downtown San José, there are inadequate places apart from SJSU for students to study at night. Jack in the Box is the only restaurant within six blocks of campus that is open 24/7, though occasionally it closes at night. There are two Denny's locations open 24/7, one 1.5 miles south of campus, and another located 3.5 miles northwest of campus.

For many of the same reasons that bars are not acceptable alternatives to studying on campus, restaurants also fail to provide the environment that students need. Restaurants are normally full of people preparing food, eating, and socializing. This can create many loud noises that can cause adverse effects for some students. Many students go to the library just to get away from all the noise. Additionally, restaurants are private establishments that can either refuse service or turn guests away for staying too long and not buying enough food. This is an equity concern that especially affects students with poorer financial situations. Such students are more likely to be turned away from restaurants for not paying the minimum amount, or be forced to spend additional money for a place to study.

137.    Harrell rents an apartment within two blocks of SJSU's downtown campus, and is quite happy with this living situation. However, Harrell recognizes that this roughly 220 square foot studio apartment is far from a sufficient place to study. The room is not large enough to create separate areas for sleep and study. Instead, Harrell mentally associates the room with sleep and other leisure activities. This means that Harrell frequently gets stuck in a demotivational rut when Harrell tries to study there. On the other hand, Harrell almost always sees more success studying elsewhere. For these reasons, Harrell seeks out spaces outside their apartment to study.

138.    Harrell's heavy academic load creates new challenges. When taking 24 credits in a semester, even the best planning will not replace the need to study for 14 hours some days, or to study all night to meet a morning deadline. These situations enhance the need for a place to study at all hours of the night.

139.    Fortunately, Harrell benefits from CSU Policy. Code of Regulations §40050 states, "The primary function of the California State University is the provision of instruction for undergraduate students and graduate students through the master's degree, in the liberal arts and sciences, in applied fields and in the professions, including the teaching profession." Other than the name change, this regulation has remained unchanged since it was passed by the California Legislature in the Donahoe Higher

Education Act of 1960 as the founding primary function of the California State College system. Since the CSU recognizes that its students' need for undergraduate instruction is part of its founding primary function, the CSU has created generous opportunities for its students to use its campus buildings to study.

140.    For several buildings on campus, including the Engineering Building, the Art Building, and Spartan Complex Central, the Building Access page on the SJSU website contains the identical policy: "Student access operating hours: M–F: 7 a.m–10:30 p.m Sat: 8 a.m–7 p.m Faculty/Staff access operating hours: All days/times" Based on a review of past versions of this page stored at archive.org, this policy has been on the site at least since March 1, 2022.

141.    The Building Access page on the SJSU website contains the policy, "After Hours Access to Locked Buildings To gain access to a locked building after hours or on weekends please contact University Police Department (UPD) at 408-924-2222. You must present a valid SJSU ID and written authorization from faculty or staff or a reservation confirmation to enter the building." Based on a review of past versions of this site stored at archive.org, this policy was added to the site sometime between March 1, 2022 and May 18, 2022.

142.    The Building Access page has no similar requirement for a student to obtain written authorization to remain in the building to continue studying after a student first enters the building during student access operating hours.

143.    The Building Access page has no requirement for a student to leave any building at the expiration of student access operating hours.

144.    SJSUPD has a Building Access Policy: Policy 353, beginning on page 257 of the SJSUPD Policy Manual dated May 21, 2020. This Policy does not imply that students have any obligation to leave University buildings after the end of student access operating hours. This Policy does not describe any policies or procedures for officers to ask or force a student to leave a University building, simply because they have stayed after the end of student access operating hours.

145.    Harrell believed that SJSU intentionally chose not to include such requirements, because SJSU understood that students often must remain in buildings later than student access operating hours in order to study.

146.    On April 26, 2022, SJSU Interim President Steve Perez wrote, "I believe that it is critical to our success as an institution to demonstrate a University-wide commitment to meeting the basic needs of our campus community."

147.    On July 13, 2022, SJSU Interim President Steve Perez wrote, "In particular, we are committed to making the elimination of equity gaps and the promotion of DEI and equitable student outcomes the top priority for the University."

148.    Due to these communications and many other communications from SJSU and CSU, Harrell believed that SJSU intentionally chose not to include such requirements described in Facts 142 and 143 because SJSU understood the impact such an additional restriction would have on students' basic needs, and because SJSU understood that imposing such a requirement would have a disproportionate impact on the disadvantaged students who needed such space the most.

149.    Harrell saw massive academic benefits due to this policy. As Harrell would later tell Defendant Day on June 3 and August 30, and Defendant Hutton on June 22, August 30, and November 18, "The only way I was able to achieve a 3.94 institutional GPA this Spring, even while doing 24 total credits this Spring,  was by spending long days and nights in University buildings cracking away at homework."

150.    Harrell is not the only student who recognizes that SJSU has no policy requiring students to leave building after the end of student access operating hours. Harrell is not the only student who benefited academically from the absence of such policy.

151.    Harrell recalls one conversation before June 3 with one SJSU student who recounted that she studied and slept in a University building the night before her exam, and then took the exam that morning and scored 100 percent.

152.     Harrell recalls a second conversation before June 3 with a second SJSU student-employee who said she believed that SJSU allowed students to remain in the building if they entered before certain times.

153.     A brief internet search reveals three social media comments, two from 2015 and one from 2012. In these posts, users responded to an original poster who sought advice about where to study at night on the SJSU campus, and shared the opinion that students could study at night in University buildings, after their Tower cards no longer allowed them access to enter, either by entering earlier when they could still use their Tower cards to enter, or by having someone inside the building open the door for them.

154.     During Harrell's many late night study visits to SJSU buildings, Harrell often noticed other students who also appeared to be studying after student access operating hours, just as Harrell was.

155.     During the Spring 2022 semester, Harrell took and successfully passed a total of 24 semester credits: 16 credits at SJSU, 5 credits at SJCC, and 3 credits at Cuyamaca College.

156.     All these classes outside SJSU were intended to fulfill Harrell's graduation requirements at SJSU. SJSU previously recognized that PHYS 004B General Physics at SJCC is an equivalent course to Harrell's graduation requirement of PHYS 51. SJSU previously recognized that MATH 245 Discrete Mathematics at Cuyamaca College is equivalent to MATH 42 at SJSU, which is a prerequisite for Harrell's graduation requirement of CMPE 126.

157.     All the classes at SJSU and SJCC had deadlines in late May. MATH 245 at Cuyamaca College was an asynchronous online course, and its instructor had more generous deadlines for finishing the course by the first few days of June. Thus, by the time Harrell completed all their SJSU and SJCC classes, they still had roughly half of the MATH 245 course left, and only a few days to finish it.

158.     Harrell proceeded to study and submit assignments for their MATH 245 class for 12 to 14 hours a day for the next few days preceding June 3. Harrell declined an

invitation to walk at their own graduation at SJCC, choosing instead to dedicate all their energy to the MATH 245 course. During the day, Harrell constantly hopped between different libraries and business establishments, seeking the best and most inspirational environments to study. At night, when these options were limited, Harrell came to SJSU. Though Harrell had mostly studied at the Engineering Building at night all Spring, Harrell felt that they were experiencing mental stagnation due to trying to study in the same place too long. This led Harrell to experiment with other buildings. This led Harrell to Spartan Complex Central.

159.    Harrell first met Defendant Lee on Saturday, August 21, 2021. Harrell recalls that Harrell entered the Engineering Building at around 4:10 pm that day to begin studying. At about 10:03 PM, Harrell called SJSUPD to report that their bicycle had been stolen. Lee responded a few minutes later and met Harrell at the south entrance of the Engineering building, facing the 7th Street Plaza. Harrell told Lee that a few minutes prior, they had left the Engineering building through that entrance, and then realized that their bike had been stolen after seeing that it was missing from the bike rack just to the right when leaving this entrance. Although the student access operating hours had ended at 7:00 pm that Saturday night, Lee did not mention this during this encounter. Harrell believed that the reason Lee did not mention this was because the University had not prohibited Harrell's conduct of entering during student access operating hours and remaining to continue studying after the end of student access operating hours.

160.    Lee's Misdemeanor Report for Case 22-0378 contains conflicting information about a previous encounter. Contrary to Lee's report, Lee did not meet with Harrell in Spartan Complex Central on June 1, 2022 at about 00:03. Harrell was not even in the City of San José at that time.

161.    Lee's second meeting with Harrell was in Spartan Complex Central during the night of June 1-2, 2022.

162.    This meeting happened a few hours after Harrell entered the Spartan Complex Central. Key card logs produced by SJSU correctly reveal that Harrell used their Tower

card at the automated reader to gain access to Spartan Complex at 20:33:31, during student access operating hours.

163.    Lee did not note in his report how the meeting began. This meeting started when Harrell approached Lee to inform Lee that they had found a lost Tower card student ID in a different part of the building. Harrell returned the Tower card to Lee and answered Lee's questions about how they had found the Tower card. Then, since Harrell realized that Lee was investigating an unrelated trespassing incident, Harrell told Lee about how they believed they might have seen the suspect doing multiple passes in another part of the building. By reaching out to engage directly with Lee, Harrell demonstrated that they were going above and beyond their responsibilities to maintain order on campus. Furthermore, in sharing information related to that police investigation, Harrell demonstrated their role as eyes and ears on campus, a legitimate extension of the SJSUPD's abilities, where Harrell would report to the SJSUPD any threats to safety Harrell saw, thus making SJSUPD better to keep campus safe, especially at night. Instead, Lee's later actions destroyed this relationship, making Harrell much more hesitant to call SJSUPD in situations where they otherwise might have been able to help, due to a justified fear that SJSUPD would only exacerbate the situation.

164.    During this same encounter, Harrell and Lee discussed Harrell's situation, discussing how Harrell needed a place to study. Harrell and Lee discussed how the SJSU Library had closed at 8 pm that night, and most business establishments downtown closed by midnight, thus motivating Harrell to come to Spartan Complex Central to study.

165.    During this meeting, Lee suggested that the Engineering Building might be a better place to study at night, because it was calmer. Lee seemed to demonstrate understanding of Harrell's educational needs by leaving the building shortly later.

166.    Lee did not ask Harrell to leave the building during this meeting.

167.    Lee's claim that Harrell left the building at that time is false. Instead, shortly after this conversation, Lee left the building with Harrell still inside. Harrell remained in the

building and continued studying until leaving Spartan Complex Central at roughly 1:47 am on June 2.

168.    On June 2, 2022, key card logs produced by SJSU correctly reveal that Harrell used their Tower card at the automated reader to gain access to Spartan Complex at 22:30:33, during student access operating hours.

169.    Understanding that they had not violated SJSU policy, and knowing that Lee had concluded the previous meeting by leaving the building and allowing Harrell to continue studying inside, Harrell was surprised when Lee approached them again.

170.    At approximately 12:47 am on June 3, 2022, Lee approached Harrell while Harrell was studying for their MATH 245 class and asked Harrell to leave the building.

171.    Lee's report correctly notes that Harrell told Lee they "had to finish studying and had nowhere else to do it".

172.    Lee's report correctly acknowledges that Lee told Harrell that they "could continue to study outside of the buildings". Harrell immediately objected that it was too cold to study outside the buildings. The outdoor temperature reached roughly 59 degrees that night. The officers simply ignored this and changed the subject. Additionally, Harrell would not have had access to outlets to charge their belongings. Lee disregarded the fact that these factors would make studying outside the buildings at night significantly worse than studying inside the buildings at night.

173.    Defendant Zonsius later arrived.

174.    Despite the fact that Zonsius worked at SJSU, Zonsius incorrectly claimed that SJSU's summer session had not started yet, thus demonstrating an ignorant disconnect with Harrell's academic context. Even if it had been true, this claim would have bee irrelevant, because SJSU students may need to study up to 366 days a year, including outside normal sessions. Even after Harrell corrected Zonsius and told Zonsius that Harrell was attending ISE 130, which had started the day before during the summer session, Zonsius ignored this and is shown on audio shortly later repeating the refuted and false claim that the summer session had not started yet.

175.    Instead of using his constitutional power to seek a way to meet Harrell's educational needs, Zonsius threatened Harrell with a three day order to stay away from campus, despite knowing that the SJSUPD did not give Zonsius the power to issue such a notice in this situation. Zonsius thus demonstrated that Zonsius was firmly opposed to Harrell's educational needs, demonstrating his total lack of understanding of a situation that had never displayed any signs of urgency.

176.    Whatever justification Zonsius may have had for escalating the situation was eroded when Zonsius said a few minutes later, "I know [Harrell] does not cause, like, a disturbance or anything." (1:14:32)

177.    The Misdemeanor Report does not document that the owner, owner's agent, or person in lawful possession ever asked the police for assistance in dealing with Harrell, or to ask Harrell to leave the building. In criminal discovery, the police did not produce any such evidence.

178.    Lee and Zonsius did not communicate to Harrell any valid request from the owner or owner's agent to leave the building. Video evidence of the encounter, which the police produced in criminal discovery, does not show that the police informed Harrell of such a request. The Misdemeanor Report does not claim that the police informed Harrell of such a request.

179.    Lee and Zonsius arrested Harrell, placing them in handcuffs, and forcibly led Harrell to Lee's vehicle.

180.    While Harrell was being led to the vehicle, Zonsius told Harrell that Lee and Zonsius wanted Harrell to get an education. Harrell responded, closely paraphrased, "Considering the fact that you're currently interfering with my education, I beg to disagree with that statement." Zonsius then responded by asking Harrell if Harrell had a mental condition.

181.    There were no factors that could have led Lee or Zonsius to reasonably believe that Harrell presented a heightened risk. Lee did not mention any such factors in his report.

182.    After Harrell was locked inside Lee's vehicle, Harrell would have had at most a minimal chance of escape. After Lee drove his vehicle inside the secure parking garage at SJSUPD headquarters, it would have been nearly impossible for Harrell to escape.

183.    Despite this, Lee and Zonsius kept Harrell in handcuffs for nearly the entire encounter, thus violating SJSUPD policy. They did not remove these handcuffs until Harrell reminded them that they were unable to sign the own recognizance citation while their hands were bound.

184.    During almost the entire encounter, Harrell was bound in an uncomfortable position in the back of Lee's vehicle, with Harrell's hands cuffed behind their back. Lee and Zonsius did not allow Harrell to stand and stretch, thus violating SJSUPD policy.

185.    Defendants' decisions to keep Harrell handcuffed and refuse Harrell the opportunity to stand and stretch served no apparent purpose, other than to punish Harrell for asserting their rights.

186.    Defendants patted Harrell down and searched Harrell's pockets without Harrell's consent.

187.    Defendants performed an extensive and intrusive search of all Harrell's personal belongings, without Harrell's consent.

188.    During this search, defendants tore through a decorative zipper on the front of Harrell's backpack, thus destroying the backpack. Harrell estimates the replacement cost of the backpack at $95.

189.    Defendants opened a bag of chocolate nuts in Harrell's backpack.

190.    Lee cited Harrell with a violation of Penal Code §602(m).

191.    Defendants released Harrell at approximately 1:41 am.

192.    Lee's report lists only one offense: "602(M) PM Trespass:occupy property without consent".

193.    This short description is misleading, and is consistent with Lee's own lack of understanding of this law. Although §602(m) can only be violated if the initial entry to be without consent, Lee never alleged that Harrell's entry into Spartan Complex Central was

without consent. Lee never challenged Harrell's claim that Harrell entered the building with consent using their Tower card during student access operating hours. Lee never mentioned in his report how he believed that Harrell had initially entered the building.

194.    Considering that Harrell's visit to the same building the previous night was transitory and had lasted roughly six hours while Harrell studied, Lee would have been most reasonable in assuming that Harrell's visit on June 2-3 would also be transitory. In his report, Lee presented no reasons why he did not believe Harrell's visit would be transitory.

195.    Lee's report claims that Harrell's belongings were scattered over a few chairs in the building.

196.    Lee's report claims that there were no other students, faculty or staff in the building at the time.

197.    Harrell never used a larger part of the building than a few chairs, and never had any intent to use these facilities for more than a few hours at a time. Harrell's use of the facilities never conflicted with anyone else's use of the facilities.

198.    These facts and claims are inconsistent with an accusation that Harrell was occupying the property.

199.    The police claimed to Harrell that there was a requirement that students must first obtain faculty or staff permission to remain inside the building after certain times. However, this is not a written SJSU policy, and this policy was only use in an effort to deny Harrell equal protection. For reasons shared throughout this document, Harrell never saw any reason to request permission from any SJSU faculty or staff to remain in SJSU buildings at night before June 3, because there is no SJSU policy that requires such permission. Harrell's later requests for such permission were for the purpose of redundancy, while Harrell also maintains that there is still no law or policy that requires SJSU students to first obtain additional permission before studying in SJSU buildings at night. Evidently, the Officers disagree. The Misdemeanor Report notes that Lee told Harrell that "if [Harrell] needed a place to study that [Harrell] needed to talk to

[Harrell's] department chair and make proper arrangements to be in buildings after hours." The Misdemeanor Report later notes Officer Lee's reasoning that Harrell had committed a crime because Harrell "did not have permission by any faculty or staff member to be inside of the building after hours". Thus, Officer Lee implied that he believed that if Harrell had received such permission, Harrell would not have been committing a crime. However, when Harrell's subsequent requests to faculty and staff for such permission were ignored and/or denied, this reveals that this additional requirement for permission did not serve a legitimate government purpose, but instead was used to arbitrarily discriminate against students like Harrell who most needed the ability to study there. In addition to many oral requests Harrell made to faculty and staff, Harrell's written requests are noted below:

    a. On June 3, 2022, Harrell wrote in an email to SJSU Vice President of Student Affairs Patrick Day, "Although we could discuss key access because that might solve some of these problems, I have not even requested after hours key access to buildings. I always made sure to enter before the closing time so as not to inconvenience anyone, and so as not to create additional work for FD&O by requesting after hours access. I only ask the University to acknowledge that my presence in University buildings after closing time is important for my education. Even without this, the least that I ask is not to be harassed and arrested when I do what I know is necessary for my education."

    b. On July 1, 2022, Harrell wrote in a email to Day, "The most important problem is that although I first shared my concerns about a place to study with you 28 days ago, I still do not have a place to study at night."

    c. On August 30, 2022, Harrell sent a Notice of Claim for Tort by email to Patrick Day, to the Office of the Vice President of Student Affairs, to the SJSU Office of Student Conduct and Ethical Development (SCED), and by certified USPS mail with proof of delivery to SCED, who thereafter acknowledged its receipt. Note that Harrell challenged elsewhere in the letter that the policy of requiring students

to leave certain buildings after certain hours does not exist, so the quoted section is not an admission by Harrell that such a policy exists: "The law itself creates an inequitable situation by leaving poor students and Pell Grant recipients with no place to study, while rich students and Pell Grant non-recipients can study in whatever place they can afford. The University has the power to change its own policies. The University has the power to open spaces for students to study overnight, but the University chooses not to. To put it bluntly, when the University attempts to dodge students' legitimate concerns by deflecting to some abstract and impactless obligation to enforce the laws that the University itself created and can change, this message to students translates quite simply: We just don't care."

d.  On November 20, 2022, Harrell sent the following quoted section by email to Student Conduct Administrator and Associate Director of SCED Mirabai Hutton, and to Hearing Officer Victoria Sexton. Harrell also presented the same comment orally to Hutton and Sexton at the student conduct hearing on November 18, 2022, and it appears on the hearing recording, which is in the possession of SCED: "Given that access to study space at night is an educational necessity, the University has a constitutional obligation to encourage this if there is a suitable means to do so."

e.  On December 16, 2022, Harrell wrote by email to Day and to the Office of the Vice President of Student Affairs, "When a student causes no threat to anyone or anything, violates no laws or University policies, and chooses to continue studying in a University building when they have nowhere else to study, the student should be encouraged, not warned [. . .] The University cannot claim to support basic needs when the University attacks the basic need of a place to study at night."

f.  Day never responded in writing to any of Harrell's messages. As Vice President of Student Affairs, Day sits on the President's Cabinet and thus has far more

authority over building access policy than any department chair at SJSU. At the student conduct conference on June 22, 2022, Hutton promised to look further into the question of where students could study on campus at night, and follow up with Harrell to discuss this further. However, she never followed up with Harrell on this issue.  If SJSU has granted building access privileges to some students, but has refused to even consider Harrell's repeated requests, SJSU is violating Harrell's right to equal protection of the laws. The question of whether Harrell had made such requests is irrelevant, because SJSU's refusal to consider Harrell's request on or after June 3 make it clear that SJSU also would have refused to consider such a request from Harrell before June 3.

200.    The Officers knew, or should have known, that any prosecution of Harrell's actions would be barred by a valid necessity defense (CALCRIM 3403).

201.    The Officers knew, or should have known, that any legal action against Harrell for the actions and omissions alleged in the Misdemeanor Complaint would be barred by Article X, Section 1 of the California Constitution, which requires the legislature, and thus police officers, to encourage education by all suitable means.

202.    The Officers knew, or should have known, that any legal action against Harrell for the actions and omissions alleged in the Misdemeanor Complaint would be barred by Article I, Section 28(f)(1) of the California Constitution, which grants Harrell, as a student of SJSU, the right to attend a campus that is safe, secure, and peaceful.

203.    The Officers knew, or should have known, that any legal action against Harrell for the actions alleged in the complaint would be barred by their denial of equal protection.

204.    The Officers knew, or should have known, that any legal action against Harrell for the actions alleged in the complaint would be barred by the fact that Harrell had consent to remain where Harrell was.

205.    The Officers knew, or should have known, that any criminal legal action against Harrell for the actions alleged in the complaint would be barred by Harrell's innocence to all sections of the California Penal Code.

**Defendants Again Pursued Groundless Student Conduct Charges against Harrell**

206.    At 4:34 am on June 3, Harrell sent an email to Defendant Day. Harrell described the facts similarly to this claim. Harrell explained, just as in this claim, why Harrell had not violated §602(m). Harrell continued, "Harrell continued, "Even though the legal case is groundless, what is far more concerning is the officers' malicious disregard for my educational needs." Harrell requested three actions from Day:

    a.    Harrell requested to meet with Day that day. Day granted this request.

    b.    Harrell asked the University to seek to drop the charge of §602(m).

    c.    Harrell pleaded, "I would like to discuss with you a plan of how I will be able to continue my studies at SJSU without fear of harassment from the police." Harrell asked to specifically discuss key card access, and concluded the message: "I only ask the University to acknowledge that my presence in University buildings after closing time is important for my education. Even without this, the least that I ask is not to be harassed and arrested when I do what I know is necessary for my education."

207.    Harrell met with defendant Day at approximately 11:00 am on June 3. The Vice President expressed concern about the lack of options for study spaces for students at night. The Vice President promised to do more research about what it would take to grant more study spaces to students, and also promised to directly reach out to the police to learn more about the situation.

208.    Roughly an hour after Harrell's meeting with Day, SCED, which is part of Day's Division of Student Affairs, received at 12:36:25 pm an Incident Report regarding Harrell's interactions with SJSUPD that morning.

209.    The Incident Report copied this claim from the Night Shift Police Bulletin: "The subject had no reason to be inside of the building after hours." This claim is false, and is contradicted by the Lee's Misdemeanor Report, as Plaintiff notes in this claim (Fact 171).

210.    After reviewing this Incident Report and discussing it with SCED Administrative Assistant Jennifer Angel, Plaintiff believes that certain information in this Incident report was written down by then SCED Director Alexandra Froehlich, and were based on a conversation that Froehlich had with Frank Belcastro of SJSUPD.

211.    Belcastro was not at the incident. Thus, Belcastro only relied on the first hand reports of Lee and Zonsius.

212.    Plaintiff found no record that Froelich ever discussed this with Lee or Zonsius. Thus, Froehlich only relied on the second hand reports of Belcastro.

213.    On November 18, 2022, Defendant Hutton first made a surprise claim that she had discussed this case with police during her investigation. However, when Harrell reviewed their record, they found no documentation of any conversation between Hutton and police. If Hutton did not separately reach out to police during her investigation, then Hutton only relied on the third hand account of Froehlich's notes of her conversation with Belcastro.

214.    This game of telephone resulted in the Incident Report lacking the most important piece of information: Harrell told Lee they "had to finish studying and had nowhere else to do it".

215.    Before conducting an investigation as required in CSU policy, Hutton sent Harrell a Notice of Conference on June 6, 2022.

216.    This letter contained threatening language, noting, "Should you be found responsible, sanctions may include [. . .] suspension; and/or expulsion."

217.    This letter contained the following description of conduct: "It was reported to our office that the police found you inside a campus building after closing. As you do not have access to the building at that time, the police issued you a citation for trespassing."

218.    The letter continued, "A review of the information suggests that the following sections of the Student Code of Conduct may have been violated: • (2) Unauthorized entry into, presence in, use of, or misuse of University property. • (16) Violation of any published University policy, rule, regulation or presidential order. • (18) Any act chargeable as a violation of a federal, state, or local law that poses a substantial threat to the safety or well being of members of the University community, to property within the University community or poses a significant threat of disruption or interference with University operations."

219.    The letter requested that Harrell schedule an appointment with SCED. Harrell scheduled an appointment the next day for Friday, June 17 at 1:00 pm.

220.    On Monday, June 13, Day followed up with Harrell to confirm that he had talked with the captain to discuss the situation. He promised to also talk with the chief and ask if it was possible to drop the charges, though he was unable to meet so far because the chief was away. Day also said that he talked with the Dean of the Library and discussed what it would take to extend the hours of the library. He promised to do further research to find out if this would be worth the cost. Day also promised to look into other areas of campus that would have a convenient and safe place for students to study at night, and that could be explicitly made available to students. Day finally promised to follow up with me again the next week after having these conversations.

221.    Unfortunately, Day broke this oral promise. Despite Harrell making more than ten attempts to schedule a meeting with Day, either by contacting Day's office or by approaching Day directly to request a meeting, Day did not schedule another meeting with Harrell until September 23.

222.    Just 27 minutes before the scheduled conference on June 17, Hutton rescheduled the conference, simply providing the excuse, "Unfortunately something as come up today and I need to reschedule our meeting." This was yet another example of how Hutton holds Harrell to a higher standard of professionalism than she holds herself, and she has no regard for how her actions harm Harrell's education.

223.    Harrell and Hutton actually met for a conference on June 22, 2022.

224.    Harrell began by noting that the Notice of Conference contained few specifics about the alleged violations, and Harrell thus asked Hutton to explain in more detail the allegations of violations of the three sections of the Student Code of Conduct.

225.    Hutton responded that she had received a two sentence report from the University Police Department alleging that Harrell had been in a University building after hours, at a time when Harrell did not have access to the building. Hutton said she did not know which building the alleged offenses occurred in.

226.    Hutton said that the Section 2 charges were because Harrell did not have authorization from the University to be in the building at that time.

227.    Hutton said that the Section 16 charges were because Harrell had violated a University rule.

228.    Hutton said the Section 18 violation arose because Harrell had been cited with trespassing.

229.    Harrell asked Hutton what specific University rule the Section 16 charges related to.

230.    Hutton responded that it was the Building Access Page on the SJSU website. Associate Director Hutton said that the alleged offense specifically related to the part of the page that Plaintiff quoted in Fact 140.

231.    Harrell asked Associate Director Hutton which federal, state, or local law the Section 18 allegations related to.

232.    Hutton responded that the report she received from the police indicated that I had been charged with trespassing.

233.    Harrell continued by asking which specific law against trespassing Harrell had allegedly violated.

234.    Hutton responded that she did not know.

235.    Harrell finally asked whether the Section 18 allegations related only to the specific trespassing law with which Harrell had been actually cited, or if the Section 18 allegations encompassed more than this law.

236.    Hutton responded that she did not know of any other conduct that fell under Section 18, so at that time the Section 18 allegations only related to the trespassing charge.

237.    Harrell continued by sharing their account of what happened on June 3, exactly as Harrell described it in their message to Day on June 3. Harrell further raised concerns about equity, as Harrell shared in Facts 146 and 148. Harrell concluded this section, "At a time when the Interim University President sends multiple campus-wide emails about the importance of meeting students' basic needs, arresting and charging a student who is just studying is hypocrisy."

238.    Harrell responded to the Section 18 allegations by pointing out that Harrell was only cited with a misdemeanor violation of California Penal Code 602(m), and Harrell had not violated that law, for the reasons Harrell shared in this complaint in Fact 192 et seq. Harrell pointed out that not only would the government be unable to obtain a conviction upon the criminal standard of proof beyond a reasonable doubt, but the exculpatory evidence of the key card logs showing that Harrell had entered using my tower card at a time when such entry was explicitly permitted constituted sufficient exculpatory evidence so that the University would not even be able to establish a violation of this law based on the lower standard of preponderance of evidence. In addition, Harrell pointed out that Section 18 has a higher standard than simply violating the law: the act in violation of Section 18 must "pose[] a substantial threat to the safety or well being of members of the University community, to property within the University community or pose[] a significant threat of disruption or interference with University operations." Additionally, Harrell pointed out that the vagueness of the language of Section 18 could not be used as an excuse to bring proceedings against a student for actions that are not actual violations of any law. Since it is theoretically possible to bring

charges against any act, whether or not it is an actual violation of the law, this interpretation would be overbroad. Thus, Harrell contended that it only makes sense that violations of Section 18 would only be restricted to acts for which the University can demonstrate to the standard of preponderance of evidence that a law has been violated, notwithstanding that this preponderance of evidence may be insufficient to warrant a criminal conviction in cases without proof beyond a reasonable doubt.

239.    Harrell responded to the Section 16 allegations by confirming that Harrell had previously read the building access page on the SJSU website, but there was nothing on the page that prohibited my behavior. Regarding the phrase "student access operating hours", Harrell pointed out that Harrell had checked multiple dictionaries prior to our meeting, and had found that most definitions of the word access had to do with the ability to enter a space, and thus this phrase did not prohibit Harrell's actions of continuing to stay and study there after the end of student access operating hours.

240.    Harrell responded to the Section 2 allegations by pointing out the distinction between explicit and implicit authorization. Harrell argued that an action cannot be deemed to be unauthorized simply because explicit authorization has not been given for the activity. Harrell raised the example of Connect Four, and Harrell contended that if two students were to enter a University building with authorization and proceed to play Connect Four there, this would not be a violation of the Student Code of Conduct, despite the fact that none of them had explicit authorization to play Connect Four. Harrell contended that their actions of staying in the Spartan Complex Central to study for their Discrete Mathematics class similarly could not be deemed to be unauthorized, since nothing they were doing was prohibited by the University.

241.    Hutton responded to Section 16, and presumably Section 2 along with it, by agreeing that some dictionary definitions of the word access refer to ability to enter, but argued that other dictionary definitions of the word encompass both entry and presence. She acknowledged that another university has a policy that allows students to remain in

buildings if they enter before a certain time, but she contended that the SJSU policy must be understood in the framework of the word access referring to both entry and presence.

242.    Hutton responded to Harrell's concerns about equity by acknowledging that Harrell had legitimate concerns about why the policies should not be enforced, but reasserted that regardless of legitimate concerns, when there is a policy, it must be enforced. Hutton compared Harrell's case to the case of a student that her office encountered after the student was found smoking marijuana inside University housing. She recounted that the student had contended that the proceedings should be dropped based on the fact that marijuana should be legal. Hutton responded that the core question was not whether there should be a law, but whether there was a law.

243.    Hutton argued that Spartan Complex Central was not the best place to study. However, when Harrell asked her what would be the best place to study, she could not name any place that would be better to study than Spartan Complex Central. She mentioned that there may be cafes or restaurants near campus that are open late.

244.    Hutton did not attempt to rebut Harrell's Section 18 arguments during this June 22 Conference, but promised to consult with University counsel and with the University Police Chief before making a decision.

245.    Hutton claimed to recognize Harrell's interest in needing a place to study at night, and promised to look further into the question of where students could study on campus at night, and follow up with Harrell to discuss this further.

246.    Unfortunately, Hutton violated this promise and never followed up with Harrell regarding this. Instead, Hutton made it clear that the only contact she wished to have with Harrell was disciplinary proceedings, and after June 22 she no longer pretended to be concerned about Harrell's educational needs.

247.    Harrell finally closed with two concerns about fairness. Just as Harrell points out in Facts 150-153, Harrell pointed out that many other students have been entering University buildings before the end of student access operating hours and staying so that they could continue studying, since the University buildings provide an excellent

environment to study. Harrell argued that it is unfair that Harrell should be subjected to adverse actions when many others do the exact same activities with impunity. Harrell also pointed out that Officer Lee had seen me on two prior occasions when I had been studying in University buildings after the end of Student Access Operating Hours. Harrell recounted both of these previous meetings, as in Facts 159-167. Harrell noted that Officer Lee did not tell them on either occasion that their behavior was forbidden. Harrell noted that On June 1 or 2, Officer Lee even left the building with Harrell still inside. Harrell argued that Officer Lee's choice on both occasions to permit Harrell's behavior without even issuing a warning demonstrated that his Department has a policy to allow officers to exercise discretion in such situations. Thus, Harrell questioned why the fact that Harrell told Officer Lee that Harrell had no other place to study never factored into his discretion. Hutton also promised to raise these concerns with the Police Chief.

248.    On July 1, 2022, at 1:03 pm, defendant Hutton on behalf of SCED sent Harrell a Resolution Agreement. The letter stated, "Following an investigation of the stated allegations, Joshua Harrell has been found responsible for violating the Student Conduct Code."

249.    The letter claimed that Harrell had violated Sections 2, 16, and 18 of the Student Code of Conduct, even though SCED had ignored most of the defenses that Harrell presented in the conference. In the areas where Hutton promised to follow up with various parties, Harrell was never informed of the result of such follow up. In the areas where Hutton deferred judgment because she said she did not have enough information to make a decision, Hutton never informed Harrell of the additional information that led her to state that she found Harrell responsible for violating the Student Conduct Code.

250.    The letter proposed two sanctions:

a.        Submission of a reflective paper. The prompt reads, "As part of a Student Conduct sanction that included suspension from the California State University (CSU) education system, you have been assigned to write a 3-5 page (750-1,250

word) reflective essay to be completed prior to possible re-admission as a student."

b.       One year of disciplinary probation. The letter describes this sanction: "Disciplinary Probation is a period of time during which privileges of continuing in Student status are conditioned upon future behavior. Conditions may include the potential loss of specified privileges to which a current Student would otherwise be entitled, or the probability of more severe disciplinary sanctions if the Student is found to violate the Student Conduct Code or any University policy during the probationary period. Disciplinary Probation shall remain on the Student academic transcript temporarily, denoting the beginning and end date of the probationary period."

251.    Hutton later clarified during the ensuing hearing on November 18, "I will also add that based on the information Joshua shared just now, it appears that the incorrect prompt was attached to this sanction. There's two versions of the same reflection paper, the difference is a single word. Based on what Joshua said, [they were] given the version that included the word suspension instead of the word probation. There's no other changes between the two prompts. So given Joshua's comments here, I'm going to actually update that sanction so there's only one prompt, it does not include either word, that way there will be no confusion in the future. It was not my prompt, it was one in the system I was using. So I'm recommending that the reflection paper be the updated prompt that does not include the word suspension in it, along with the one year of disciplinary probation."

252.    After Hutton's proposed revisions, the reflective paper prompt would still include words describing the sanction as "to be completed prior to possible re-admission as a student."

253.    Thus, SCED intended to impose a sanction that required the student's agreement to participate. If the student refused to turn in the reflective paper, or if SCED was unsatisfied with the result, SCED would still seek suspension.

254.    The July 1 letter requested a response within 10 business days, by July 18. The letter stated that if Harrell did not respond by that date, the University would proceed to a hearing.

255.    The same day, just 15 minutes after receiving the Resolution Agreement, Harrell sent an email to Day at 1:18 pm: "I'm checking in to see if there is any update in this case. When we met over the phone on June 13, you promised to follow up with me again after meeting with the police chief and meeting with the SJSU Cares team. The most important problem is that although I first shared my concerns about a place to study with you 28 days ago, I still do not have a place to study at night. Since there are many things to talk about, I think it is best that we talk over the phone or in person."

256.    Day never responded to this email.

257.    This deadline was extended multiple times by SCED and Day. After the final extension, the new deadline was August 29.

258.    On August 30, 2022, Harrell sent SCED a Notice of Claim for Tort, as described in Fact III.45.b.

259.    This Notice of Claim for Tort described the facts leading up to both student conduct cases, and described and expanded on Harrell's defenses in each case. Harrell asserted that they had not violated any of the sections of the Student Code of Conduct with which they were accused, and demanded that SCED close both cases with no finding of guilt, and demanded that the University inform the District Attorney that the University had exculpatory evidence that Harrell did not commit the crime with which the UPD cited Harrell, and that the University did not wish for criminal charges..

260.    In that Notice of Claim for Tort, Harrell cited Giaccio v. Pennsylvania, 382 U.S. 399 (1966), pleading that the Building Access page was at best a vague policy, and the US Supreme Court declared that vague laws violate the Due Process clause. Harrell pleaded that the central phrase of "student access operating hours" was too short and vague to create an obligation for students to leave the building after they expired. Since

the word "access" had multiple definitions, some of which supported Harrell's innocence, Harrell explained that this made it a vague policy.

261.     In that Notice of Claim for Tort, Harrell cited Goss v. Lopez, 419 U.S. 565 (1975), claiming that Harrell was entitled to due process in student conduct proceedings because SCED was seeking suspension, and because SCED was seeking to note misconduct on Harrell's transcript.

262.     In that Notice of Claim for Tort, Harrell challenged how Hutton rejected Harrell's legitimate equity concerns based on her maxim that "when there is a policy, it must be enforced". Harrell called Hutton's comparison of Harrell's case to that of a student who was found inside a building smoking marijuana "quite offensive". Harrell continued, "To put it bluntly, when the University attempts to dodge students' legitimate concerns by deflecting to some abstract and impactless obligation to enforce the laws that the University itself created and can change, this message to students translates quite simply: We just don't care."

263.     In that Notice of Claim for Tort, Harrell complained that SCED charged Harrell with a violation of Section 18 despite never presenting the necessary evidence under Section 18 that my actions created a threat. Harrell asserted that SCED had thus violated Goss by failing to provide "an explanation of the evidence the authorities have."

264.     In that Notice of Claim for Tort, Harrell explained in more detail why off campus study spaces are insufficient, just as in Fact 136.

265.     In that Notice of Claim for Tort, Harrell alleged that the University had violated CSU Executive Order 1098 (III)(A)(2) in both cases when Hutton failed to conduct a basic investigation before sending the Notice of Conference.

266.     In that Notice of Claim for Tort, Harrell alleged that the University had violated CSU Executive Order 1098 (III)(B)(2)(a) by failing to include in the Notice of Conference the Campus policies that were the subject of the charges. Particularly, when a student is accused of violating Section 16 of the Student Code of Conduct, this section

cannot logically stand alone. It must be accompanied by a separate specific campus policy that the student is charged with violating.

267.    In that Notice of Claim for Tort, Harrell alleged that the University had violated CSU Executive Order 1098 (III)(B)(2)(b) in both cases by failing to include in either Notice of Conference a factual description of the Student's alleged conduct that forms the basis for the charges.

268.    In that Notice of Claim for Tort, Harrell alleged that the University had violated CSU Executive Order 1098 (III)(B)(2)(d) in both cases by failing to include in either Notice of Conference the location on the Campus where the Student can view their discipline file.

269.    In that Notice of Claim for Tort, Harrell alleged that the University had violated CSU Executive Order 1098 (III)(B)(4), (III)(C)(1), and (III)(C)(2)(b) by failing to send its Resolution Agreement promptly after the conference, and because of its failure to schedule a hearing within ten days after the conference.

270.    In that Notice of Claim for Tort, Harrell alleged that by violating CSU policies, defendants had breached their contracts.

271.    After sending the Notices of Claim for Tort, Harrell's next contact with Day was on September 15, 2022, when Harrell approached Day in person to request a meeting, reminding Day of how Day had violated his previous promises to meet with Harrell earlier.

272.    Day actually met with Harrell on September 22, 2022.

273.    Day informed Harrell that University Personnel had closed its review of the April 20 AEC case in response to Harrell's report of discrimination and retaliation, and there was thus no way for the University to reopen it.

274.    Harrell noted that the warning that SCED had issued on May 23 meant that Harrell was being treated differently from all the other students who had also agreed to follow the Student Code of Conduct, but who had not received such an additional specific warning. Harrell asked Day whether this warning could later be used to subject Harrell to

greater sanctions for a later offense than another student who had committed the exact same offense, but had not received such a previous warning.

275.    Day responded that in considering the totality of the circumstances, SCED could use the existence of a previous warning as justification for greater sanctions if the second offense was a similar type of offense.

276.    Harrell explained that this was why it was so important for Harrell to continue to contest the due process violations that SCED had committed in the first case.

277.    Day informed Harrell that Day had spoke with the SJSUPD Chief of Police, and that the Chief had responded that he had no plans to drop the charges.

278.    When Harrell objected that Harrell had explained in writing to Day why there was no evidence that Harrell had committed the alleged crime, Day responded that there was simply a lack of will to drop the charges.

279.    Day told Harrell that there was no way for Harrell to avoid accountability for their actions.

280.    Harrell insisted that the issue was black and white: since Harrell had not violated the law, the SJSUPD must seek to drop the charges.

281.    Day responded that this was an issue for the SJSUPD, and not an issue for Day's Division of Student Affairs.

282.    Harrell responded that because SCED, which is part of Day's Division of Student Affairs, had accused Harrell of violating Section 18 of the Student Code of Conduct, SCED had an obligation to inform Harrell which law SCED believed Harrell had violated, and why SCED believed that Harrell had violated that law, but SCED had thus far failed those obligations.

283.    Day promised to do further research on this point, but Day never responded to Harrell regarding this argument.

284.    Day argued that the officers' actions might be justified by a need to protect University property by preventing students from vandalizing it or stealing from it. Day

explained that he did not know Harrell expected him to come up with a better solution that would work with a student body of 39,000 students.

285.    Harrell responded that any fears the officers could have had that Harrell might hypothetically cause harm did not justify the officers' decisions to actually cause harm to Harrell. Harrell further argued that Day's concerns did not justify treating staff and students differently.

286.    Day responded that staff had a higher level of responsibility than students. Day explained that if staff were to commit theft or vandalism, staff would be fired.

287.    Harrell responded that accountability was not unique to staff. Harrell noted that if a student were to commit theft or vandalism, a student could be suspended or expelled.

288.    Day told Harrell that he had spoken with the Dean of the University Library, who had said that there simply was not enough workforce to keep the library open 24/7.

289.    Harrell responded that although keeping the library open 24/7 would be ideal, it was not the only way to meet the needs of students who had no other place to study. Harrell shared equity concerns about how this was a need disproportionately experienced by disadvantaged groups, as Harrell shared in Facts 18, 135, and 136

290.    Though Day acknowledged these concerns, Day responded that he did not see how this created an obligation for the University to make study space available to students.

291.    Harrell concluded by noting that Day had not addressed Harrell's concerns in the Notice of Claim for Tort about how SCED had violated Harrell's due process rights, and noted that all of these were also reasons why the SCED charges should be dropped.

292.    Harrell concluded by citing CSU Executive Order 1098 (III)(B)(6) and informing Day that this section gave Day the authority to immediately close the SCED case with no finding of guilt, and Harrell requested this. Harrell finally stressed to Day that it was important that the University respond in writing to the Notice of Claim for Tort. Harrell offered to extend the 45 day timeline for the University to respond, but Day did not request this.

293.    By October 31, 2022, Harrell correctly believed that SCED had given up its ability to seek sanctions in this case, because the University had not responded to the Notice of Claim for Tort, and SCED had not informed Harrell of any extended timelines as required by CSU Executive Order 1098 (II)(G). Harrell interpreted that SCED must have decided that sanctions were not worth pursuing.

294.    However, on October 31, 2022, at 10:15 am, Defendant Hutton on behalf of SCED sent Harrell a message, writing, "At this time, the university will be proceeding to a Hearing on the alleged violations of the Student Conduct Code."

295.    Harrell responded at 1:47 pm, "Executive Order 1098 (III)(C)(1) requires, "The Student Conduct Administrator shall issue a Notice of Hearing within 10 Working Days after the conference has concluded." This letter was issued on 10/31/2022, 131 calendar days after the conference, and 62 calendar days after the most recent correspondence in this case, which was when I sent your office a Notice of Claim for Tort on 8/30/2022. Does the University have any reason for denying me the speedy process protections laid out in California State University Policy? Does the University have any response to the 15 grievances in the Notice of Claim for Tort I sent your office on 8/30/2022 in which I noted that your office has violated, among others, the United States Constitution, California State University Policy, and SJSU campus policy? For all the reasons that I laid out for your office in the Notice of Claim for Tort on 8/30/2022, it is in the best interest of the University not to schedule a hearing, and to close all cases against me with no finding of guilt. The University's continued disregard for the law will only increase legal liability for the University."

296.    Instead of responding to Harrell's message, Hutton instead forwarded it to SCED Interim Director Staci Gunner.

297.    Gunner responded at 3:11 pm, "Thank you for your e-mail and question about the process. As an outcome of your Conduct Conference, Associate Director Mira Hutton presented you with a Resolution Agreement, providing you the option to agree to the responsible outcome and sanctions by signing the Resolution Agreement or elect to go to

a Hearing. While we strive for a prompt process, the timelines are not absolute and, in your situation, are a result of your request(s) to meet with the Vice President for Student Affairs. Now, the timeline extension given to you by the Vice President for Student Affairs has expired. At this time, the university will proceed with a Hearing on the alleged violations of the Student Conduct Code. You will be notified once a Hearing Officer is assigned and the Hearing is scheduled. Per CSU Executive Order 1098, you will be given ten (10) days notice and you will be provided with additional information and resources at that time. As a reminder, you may waive your right to a Hearing by accepting the proposed Resolution Agreement, which is attached to your e-mail from Associate Director Mira Hutton. Finally, you have the right to file a claim against the California State University or one of its campuses; that information can be found by clicking this link."

298.    At 5:17 pm, Harrell responded, noting that Gunner's explanation of the timelines conflicted with the facts. Harrell noted that Gunner's explanation did not explain the 16 days of silence from SCED between the Notice of Claim for Tort and the day Harrell first approached Day again to request a meeting, or the 38 days of silence from SCED between the last time Harrell met with Day and SCED's October 31 Hearing Update. Harrell also noted that SCED had never informed Harrell that it intended to extend those timelines. Gunner never responded to these concerns.

299.    In this same message, Harrell closed by warning SCED: "The total silence from SCED in response to my 31 page report would prevent us from reaching a settlement, and would make a court intervention necessary."

300.    Gunner responded on November 1, "Thank you for your e-mail. You are invited to bring all of this forward in the Hearing. As a reminder, you'll receive additional information, once a Hearing Officer is assigned, via Associate Director Mira Hutton. In addition, a reminder that your claim is to be filed by clicking this link."

301.    On November 3 at 1:55 pm, Harrell responded, objecting that the Hearing is a disciplinary proceeding, and is the wrong venue for Harrell to voice their concerns.

Harrell again bemoaned SCED's policy of total silence in response to Harrell's Notice of Claim for Tort.

302.    At 2:39 pm, Gunner responded, "Thank you for your e-mail. To clarify, these are two separate processes. The Hearing is strictly to address your alleged student misconduct. Any legal violations will go through the system-wide claim process, which I can confirm has been received and forwarded to the appropriate parties."

303.    At 12:21 pm on November 3, defendant Hutton on behalf of SCED sent a Notice of Hearing to Harrell. This Notice of Hearing was superseded the next day by a Notice of Hearing on November 4, to reschedule the hearing after Harrell noted that the originally scheduled day would be much worse for their schedule.

304.    In an effort to pressure Harrell into accepting the proposed sanctions, motivated by defendant's financial interest in avoiding hearings, the Notice of Hearing contained threatening language: "The Hearing Officer may recommend and the Vice President for Student Affairs may impose more severe sanctions."

305.    Despite Harrell's warnings in the Notice of Claim for Tort as noted in Fact 266 that the Notice of Conference had violated CSU policy by not including in the Notice of Conference the campus policies that are the subject of the charges, defendants violated CSU Executive Order 1098 (III)(C)(3)(A) in exactly the same form by failing to include in the Notice of Hearing the campus policies that are the subject of the charges. The Notice of Hearing contains the same three sections of the Student Code of Conduct mentioned in Fact 218, with no new policy added or dropped. The Notice of Hearing still alleges a violation of Section 16 of the Student Code of Conduct, without specifying which separate campus policy the student allegedly violated.

306.    Despite Harrell's warnings in the Notice of Claim for Tort as noted in Fact 267 that the Notice of Conference had violated CSU policy by not including in the Notice of Conference a factual description of the Student's alleged conduct that forms the basis for the charges, defendants violated CSU Executive Order 1098 (III)(C)(3)(b) in exactly the same form by failing to include in the Notice of Hearing a factual description of the

Student's alleged conduct that forms the basis for the charges. Instead, the Notice of Hearing contains exactly the same description of conduct in the Notice of Conference as mentioned in Fact 217, again failing to describe any of Harrell's conduct.

307.    Other than the proposed sanctions, the Notice of Hearing contains no information specific to Harrell's case that Hutton did not already included in the Notice of Conference before Hutton even met Harrell to discuss the charges. Thus, in drafting the Notice of Hearing, Hutton chose to ignore all of Harrell's defenses, warnings, and legal arguments, both written and oral. Instead, Hutton intended to proceed to a hearing based only on the insufficient accusatory pleadings she had prepared based on only a two sentence report (Fact 225).

308.    65 days after Harrell complained in the Notice of Claim for Tort that SCED had failed its CSU Executive Order 1098 (III)(B)(2)(d) obligations to inform the student of the location on the Campus where the student can view their discipline file, SCED finally informed Harrell in the Notice of Hearing of where and how they could view their discipline file. Harrell visited the SCED office at around 2:18 pm on November 3, less than 2 hours after the first Notice of Claim for Tort was sent. Harrell met with Gunner there. Gunner did not allow Harrell to view their discipline file the same day, but asked Harrell to list times when they would be available. Harrell offered multiple times, including the next day. SCED responded by choosing the latest of those times, November 8 at 12:00 pm. Harrell confirmed this time and visited the SCED office at that time. This was the first time Harrell was allowed to review their discipline file. This was also the first time that Harrell learned that SCED also had other documents relating to the previous case involving the AEC, although Harrell did not view those documents on November 8.

309.    On November 8, Harrell found in their discipline file, and viewed for the first time, the Incident Report and Night Shift Police Bulletin mentioned in Facts 208-209.

310.    On November 10, Harrell responded to SCED's request to submit evidence. Between November 10 and November 15, Harrell submitted four documents to Hutton

and SCED. Gunner confirmed that all four of these documents would be made available to the hearing officer:

a.  A screenshot of Harrell's appointment confirmation with Day on September 23, discussed in Facts 272-292.

b.  A conversation containing two emails from Harrell to Day on June 3 and July 1, as mentioned in Facts 206 and 255.

c.  A screenshot of Harrell's location log during the night of July 2-3, 2022.

d.  Lee's Misdemeanor report.

311.  Harrell also informed SCED on November 10, "I also want to present Tower card logs as evidence. I want to request a record of all the times my Tower card was recorded to have been used on June 2 and 3, 2022. How can I obtain these logs?"

312.  Harrell did not receive a response to this message until Gunner responded on November 14 to suggest that Harrell contact SJSU Facilities Development & Operations (FDO). Harrell did so in an email to FDO 61 minutes later on November 14. Harrell also visited FDO in person on November 15 to inquire about the request they had sent by email. FDO actually sent the logs on December 8, far too late to include them in the hearing. This evidence should have been included in the hearing, because the logs showing that Harrell used their key card to access Spartan Complex Central is exculpatory evidence, conflicting with Hutton's accusations that Harrell had accessed the space without authorization.

313.  Harrell attended the Hearing on November 8, 2022. There were three participants in total: the Hearing Officer was Victoria Sexton, and the Student Conduct Administrator was Hutton.

314.  Although the Hearing should have been recorded by the Hearing Officer or her delegate in accordance with CSU Executive Order 1098 (III)(D)(5) and defendants' promises, there is a gap in the Hearing recording. Harrell discovered this gap when they reviewed their discipline file on November 29. Harrell reported this gap to Sexton, Gunner, and Hutton the next morning: "Although I previously visited the SCED office to

review my file on 11/22, I did not review the audio recording during that time, and I thus did not discover this gap until I returned to view my file again on 11/29. The official audio recording is required by EO 1098 (III)(D)(5). Jennifer Angel presented to me two audio files on the computer in the SCED office. The first file was 4 minutes and 0 seconds long. The second file was almost 1 hour 45 minutes long. Jennifer informed me that the first file preceded the second file. Toward the end of the first file, I pleaded at 3:08, 'I'd like the opportunity to ask Mira some questions regarding this.' Victoria correctly ruled at 3:36, 'Mira will share her perspective of what occurred and then you get the chance to ask her questions.' Shortly later, Mira interrupted Victoria at 3:53, saying, 'Just to pause, Victoria, the process is that I share my side, Victoria is then allowed to ask me q' At this point, the hearing recording abruptly ends. The second audio file skips a significant portion of the hearing and resumes with me saying, 'um, the Supreme Court decision Goldberg v. Kelley, I believe that I should be able to ask the student conduct administrator questions during this hearing'. I recall that during this unrecorded portion of the hearing, Mira ruled that although the Hearing Officer would be permitted to ask the SCA questions, the student would not be permitted to ask the SCA questions. I recall that Victoria concurred with this ruling during the unrecorded portion, thus overturning Victoria's own previous ruling that I would be allowed to ask questions to Mira. At the moment the second file began, I was pleading based on Goldberg v. Kelly. The SCA's decision to assume an adjudicatory role and issue rulings during the hearing conflicted with her role as a party to the hearing and deprived me of due process, as I previously argued in Due Process Violation 6 of my post-hearing written defense pleadings based on Nightlife Partners Ltd. v. City of Beverly Hills (2003). Jennifer noted to me that there was no explanation in my file for why there was a gap in the recording. It is my understanding and recollection that in accordance with the terms of EO 1098, Mira made the recording. Thus, it is critically important that Mira explains directly, without deflecting to any of her colleagues, what happened, why there is a gap in the recording, and why the circumstances of the gap in the recording were not noted in writing

immediately after the hearing. Without any explanation, this would logically foster suspicions that Mira intentionally did not record that section in order to ensure that there would be no record that she illegally attempted to issue a ruling during the hearing."

315.    When Harrell returned to the SCED office on December 1, Harrell briefly met with Staci to stress how important it was that Hutton respond regarding the gap in the hearing recording.

316.    On December 2, Gunner simply responded, "The gap in the recording was due to a technology glitch." Hutton never responded. Gunner never attempted to explain why the gap in the recording was not noted in writing immediately after the hearing.

317.    Before the beginning of the hearing recording, Sexton advised Harrell that the hearing was not to discuss Harrell's Notice of Claim for Tort, but was only to discuss the alleged violations of the Student Code of Conduct.

318.    The Hearing Officer asserted this same belief twice during the hearing recording, and interrupted Harrell twice while Harrell was complaining of due process violations that should have been admissible in the hearing:

    a.   At 48:24 in the second recording, Sexton interrupted Harrell while Harrell was complaining about how SCED had violated various policies by failing to conduct a proper investigation. Sexton said, "Before we proceed, Joshua, sorry. Before we proceed, I do wanna remind you that the focus of this hearing is the policy that was allegedly violated and not the complaint against SCED. So I just wanna bring this back on track and I wanna make sure that we're on that track, ok?"

    b.   Shortly after the 1:12:01 mark in the second recording, Sexton interrupted Harrell while Harrell was complaining about how SCED had needlessly delayed the investigation. Sexton said, "Joshua, I'm gonna pause a second. We're getting back into talking about the actual policies around the hearing, and I can't - we're here to talk about the actual policy violation of the incident and not the way SCED handled that. That's going through a separate process that I have nothing to do with. And so, in the interest of time, and just making sure you have the ability

to share the most that you can about what we're here to talk about today, I'm just gonna remind us that that's why we're here today."

319. On November 29, Angel told Harrell that Gunner is responsible for training all the hearing officers. Since Sexton acknowledged that she was new to the Hearing Officer role, this made Harrell concerned that Gunner may have trained Sexton before or even during the case. Specifically, Sexton's unreasonable attempts to limit the scope of the hearing in Fact 318 used suspiciously similar wording to Gunner's attempts to limit the scope of the hearing in Fact 302.

320. Four times during the hearing, Sexton granted Hutton far too much of a role of authority in the hearing:

    a.  At 0:00:17 in the second recording, Sexton said, "Pulling up my objections, and Joshua, I wanna thank you for your patience as I'm still fairly new to the hearing officer role myself and so I may come to Mira with some questions just about procedural pieces as I'm still learning."

    b.  At around the 6 minute mark in the second recording, Harrell asked Sexton for clarification about what Sexton had just said. Instead, Hutton answered Harrell's question on behalf of Sexton. Hutton began, "I can answer that for Victoria just to be helpful since I'm the one that lives in 1098." Sexton did not prevent this, so Harrell had to ask Sexton, "Is this the hearing officer's understanding as well?" Sexton responded, "As I mentioned, I'm new, so yes, I would say so, but I also appreciate Mira for guiding me through this because I do not live in 1098 at all like Mira does so she has a much vaster understanding."

    c.  At around the 25:00 mark in the second recording, Sexton said, "And again, Mira lives in this process well more than I do [. . .]"

    d.  Throughout the hearing, Sexton and Hutton were apparently communicating by screen sharing. At various times during the hearing, Sexton asked Hutton which script Sexton should use for a specific situation, and Hutton answered and pointed to it. Harrell was never offered an opportunity to see the screen that Sexton and

Hutton were looking at during the hearing, and Sexton never asked the same advisory questions to Harrell.

321.    Although Sexton initially ruled that she would allow Harrell to ask questions to Hutton, Sexton reversed this ruling after allowing Hutton to overrule her during the unrecorded portion of the hearing. In addition to the details provided in Fact 314, Sexton declared at 4:43 in the second recording that Harrell's objection that they should be able to ask Hutton question was "outside of the scope of this hearing", and stated, "I can't make a decision until I consult with the VP of Student Affairs about your objection." Shortly after 21:04, Harrell cited and quoted *Goldberg* and again pleaded that it was a fundamental 14th Amendment due process right that Harrell should be able to cross examine Hutton. Sexton responded, "As far as be able to ask Mira questions, and her respond to them? And again, Mira lives in this process well more than I do but my understanding is we aren't able to go in that direction because that's not the process that is in place. So you have an opportunity to present your side and then the next step in this process is that I will ask Mira to present related information based on what you have shared, and so Mira will get one opportunity to speak, but we can't do it in a question answer type of format that you're asking, per the procedure for 1098."

322.    Hutton spent about three minutes presenting her accusatory pleadings, beginning at 17:03 in the second recording.

323.    Hutton presented a surprise claim that she had spoken with the police during her investigation. This claim was not corroborated by anything Harrell found in their discipline file when they searched it on November 8. On these grounds, Harrell objected to this claim during the hearing.

324.    Hutton repeated Lee's false claim in Fact 167 that Harrell had voluntarily left the building immediately after a conversation with Lee. Harrell noted that according to Lee, the June 3 arrest was documented with body worn camera footage. Harrell noted that if this is true, then the June 3 footage would show Lee acknowledging that he had allowed Harrell to stay in the building the previous night. However, Harrell noted that they had

only found out that Lee's false claim was in their discipline file on November 8, 10 calendar days before the hearing. Harrell complained that this just was not enough time for Harrell to obtain the footage. Harrell thus argued that the footage had been unfairly excluded from the hearing.

325.    Hutton presented a surprise allegation that Harrell had refused to leave the building when requested by police. As Harrell noted in Facts 217, 267, and 306, Hutton intentionally misled Harrell in both the Notice of Conference and the Notice of Hearing to believe that Harrell was charged only based on the alleged conduct of being found in a building after closing. This is based on only the most generous interpretation that the Notices alleged any of Harrell's conduct at all, which Harrell denies. Hutton's surprise allegation during the hearing far exceeded the bounds she had set for herself in her notices to Harrell. This deception severely prejudiced Harrell's defense, because Harrell was denied an opportunity to prepare a response to this allegation before the hearing. Harrell believes that Hutton also failed to present this allegation during the Conference. On these grounds, Harrell objected to this allegation and stated during the hearing that they refused to respond to it.

326.    Throughout Harrell's defensive pleadings, Harrell noted various points where Harrell should have had the opportunity to cross examine Hutton in order to solidify her answers to different points where Hutton was vague or had not responded, or where there seemed to be contradictions. Harrell argued that in these specific areas, they had been prejudiced because they had been denied the right to ask questions to Hutton.

327.    Harrell began by citing and quoting Goss v. Lopez and the 14th Amendment Due Process Clause. Harrell asserted that since SCED sought to suspend Harrell and enter misconduct charges onto Harrell's record, *Goss* provided Harrell with due process rights, which the Hearing Officer had to protect.

328.    Harrell argued that the Hearing Officer should apply a de novo standard of interpretation to CSU Executive Order 1098 and the Student Code of Conduct. Harrell objected to Executive Order 1098 (II)(E), saying that the courts had found (Doe v.

Regents of University of California (2016) 5 Cal.App.5th 1055 [210 Cal.Rptr.3d 479], citing Berman v. Regents of University of California (2014) 229 Cal.App.4th 1265, 1271 [178 Cal.Rptr.3d 62]) that although the courts lent great weight to the University's interpretation of its own policies, the University must follow its own policies and procedures where student discipline is at issue. Thus, Harrell argued that the Hearing Officer had to independently ensure that Hutton's interpretations were reasonable.

329.    Harrell argued that the Hearing Officer should independently interpret the Student Code of Conduct, lending no special weight to the University's interpretation. Harrell argued that if the Student Code of Conduct is sufficiently vague that the Hearing Officer needs Hutton to explain to her what it means so that she can understand that Harrell violated it, then the Student Conduct Code would violate the Supreme Court's proscription against vague laws in *Giaccio*.

330.    Harrell complained that SCED had violated Harrell's due process rights by failing to conduct an investigation. As a result, Harrell specifically noted that Hutton had found no evidence that Harrell had violated Section 18 by the time Hutton officially concluded her investigation.

331.    Harrell complained that SCED had violated Harrell's due process rights by continuing its investigation after the Notice of Conference, although CSU policy required that the investigation be complete before the Notice of Conference.

332.    Harrell complained that these investigational abnormalities deprived Harrell of notice, though such notice was required by *Goldberg*. Hutton failed to inform Harrell of crucial pieces of information on which Hutton's case rested, because Hutton obtained the information after the Conference and never included it in Harrell's discipline file.

333.    Harrell complained that SCED had violated Harrell's due process rights, and deprived Harrell of notice, by denying Harrell access to their discipline file. Harrell complained that they were unfairly prejudiced during the conference because they did not know what were the contents of their student discipline file.

334.    Harrell complained that SCED had violated Harrell's due process rights, and deprived Harrell of notice, by failing to include in any of the Notices a factual description of Harrell's alleged conduct that formed the basis for the charges.

335.    Harrell complained that SCED had violated Harrell's due process rights, and deprived Harrell of notice, by failing to provide any evidence that Harrell had violated Section 2 of the Student Code of Conduct.

336.    Harrell complained that SCED had violated Harrell's due process rights, and deprived Harrell of notice, by failing to provide any evidence that Harrell had violated Section 18 of the Student Code of Conduct. Particularly, Harrell complained that SCED had never even informed Harrell which law Harrell had allegedly violated. Because Sexton denied Harrell the opportunity to ask questions to Hutton, Harrell instead asked Sexton, shortly after 1:03:00 in the second recording, "Which law does SCED claim was violated in this case?" Sexton responded, "I don't have the answer to your question."

337.    Harrell complained that SCED had violated Harrell's due process rights, and deprived Harrell of notice, by failing to provide Harrell in writing before the Conference or before the Hearing a complete list of policies that Harrell had allegedly violated. Harrell explained, just as in Fact 305, that SCED had alleged that Harrell had violated Section 16 without specifying which policy Harrell had allegedly violated.

338.    Harrell defended that the Building Access policy on the SJSU website did not prohibit Harrell's alleged activity.

339.    Harrell  complained that SCED had violated Harrell's due process rights by unnecessarily delaying the student conduct process for months, and violating CSU's requirement for SCED to inform Harrell of the reason for any timeline extensions. Harrell argued that this unjustified delay alone should result in a dismissal of the case.

340.    Harrell complained that the University's actions threatened wealth equity, and disproportionately impacted students with a worse financial situation.

341.    Harrell argued that allowing students to remain in University buildings to continue studying was an educational necessity, because students had insufficient options outside the University to study at night.

342.    Harrell argued that the University had an obligation to encourage education in this instance. Harrell cited Government Code §40050, Brown v. Board of Education (1954) 347 U.S. 483, Article IX, Section I of the California Constitution, and Serrano v. Priest, 487 P. 2d 1241 (1971), claiming that the University had an obligation to encourage education by allowing students to study in University buildings at night. Harrell claimed that the University's founding primary function (Government Code §40050) included the provision of undergraduate instruction, and that in this case the University had an additional obligation because the suspect classification of wealth was involved (Serrano, supra).

343.    Harrell again noted that the University had failed to present any evidence that Harrell's actions caused harm to anyone or anything. Harrell again noted that the University could not find that Harrell had violated Section 18 if the University could not articulate what threat Harrell's actions had caused.

344.    Harrell complained that the University's actions deprived Harrell of the equal protection of the law, as guaranteed in the 14th Amendment. Harrell argued based on United States v. Carolene Products Company, 304 U.S. 144 (1938), Romer v. Evans, 517 U.S. 620 (1996), and Serrano (supra) that the University had failed to demonstrate that there was any legitimate governmental purpose (Romer, supra) that could be fulfilled by arresting a student who was only studying, or by enforcing a law requiring students to leave the building in this context. Harrell argued that financially disadvantaged students were a "discrete and insular minority" because they are less able to afford to use normal political processes to prevent harm from happening to us, and that any policy that disproportionately harmed us should be subjected to a "correspondingly more searching judicial inquiry", which Hutton had completely ignored.

345.    Harrell noted that SCED had received notice that SCED was violating the law. Harrell described several of the claims in the Notice of Claim for Tort, and concluded, "[CSU Executive Order] 1098 (III)(D)(7) begins, "The Hearing Officer is responsible for maintaining order during the hearing and makes whatever rulings are necessary to ensure a fair hearing." SCED violated many laws and policies, received notice that it was violating those laws and policies, and never attempted to correct the harm caused by its violations of laws and policies, some of which harm is irreversible. The Hearing Officer should apply this standard of fairness, recognizing that SCED's refusal to be held accountable to laws and policies means that SCED is unable to hold me accountable for allegedly violating laws and policies, and as a result, all the charges should be dismissed."

346.    Harrell complained that the proposed sanction of a reflective paper was unnecessary because Harrell had already far exceeded the requirement with their August 30 Notice of Claim for Tort.

347.    Harrell complained that the proposed sanction of disciplinary probation was disproportionate because SCED says that it would enter a record of this disciplinary probation on the student's academic transcript. Harrell continued, "I may need to share my transcript with people outside the university, such as employers or other schools, and they may interpret disciplinary probation as a stain on my transcript without listening to my explanation, when the reality is that the true story refers to my willingness to study for 14 hours a day despite significant adversity, and I will harness these same character traits to apply myself vigorously to school assignments and work projects."

348.    Harrell requested a stay of any sanctions.

349.    Harrell concluded, "All charges must be dismissed with no finding of guilt, and no sanctions should be imposed."

350.    Sexton responded, "If you would like to email me your statement that you maybe had to shorten or didn't get to, you're welcome to do that. I would ask that you do that before this upcoming Wednesday, at 5 pm."

351.    When Sexton asked Hutton to recommend sanctions, Hutton ignored all Harrell's legitimate responses and defenses, except as noted in Fact 251. Hutton responded, "The recommendation from our office is disciplinary probation for one year, and the completion of a reflection paper. For context, I reviewed all cases where students were arrested by police for trespassing in a building, focusing on cases like Joshua where a student entered a space they did not have a- when they did have access and chose to stay in the building after that access period had ended. And I also looked at cases where there was no secondary violation, right. The student was not using drugs, or theft, or anything like that. In these cases, the typical sanction given was one year of disciplinary probation and a reflection paper."

352.    Harrell responded, "Just because that's what SCED has done in the past does not mean that SCED should continue doing it if they have been applying the wrong penalties. Secondly, there's no analysis of how my case differs from the other cases in regards to my educational needs, whether the other students were trespassing in order to do something else. And finally, throughout this entire hearing, the SCA has formed no analysis of at all of the University's abilities to and obligations to meet my educational needs and of all the legal points I shared today."

353.    Sexton then asked Hutton, "Does the Student Conduct Administrator have points of clarification or relevant information to present at this time?"

354.    Instead of telling Sexton and Harrell what law Harrell was accused of violating under Section 18, or what threat their actions caused under Section 18, or acknowledging when she had had her conversation with the police and which officer she had spoken with, or whether Harrell had correctly quoted Hutton's statements at the conference, or clarifying which elements of Section 2 SCED was accusing Harrel of violating, or presenting a dictionary definition of access that she believed supported her case, or explaining the timelines in which she conducted her investigation, or acknowledging any of the contents of Harrell's August 30 Notice of Claim for Tort, or explaining why she never provided Harrell with an explanation of why SCED delayed the student conduct

case for months, or confirming any of the contents of Harrell's file, or explaining why SCED had not provided Harrell with access to their discipline file until November 8, or withdrawing her requests for unreasonable sanctions, or, best of all, stating her intent to close the case with no finding of guilt against Harrell, Hutton responded, "Not at this time."

355.    Sexton responded, "Ok. I don't have any questions for you, so at this time, the hearing is concluded. I will [inaudible] obligations, my next step is to consult with the Vice President for Student Affairs and at that point, if the hearing is deemed to have been the course we were supposed to take, I will privately consider the information presented, and will submit my written report of findings and conclusions, along with any recommended sanctions to the Vice President for Student Affairs within 10 working days after this hearing. The Vice President for Student Affairs will notify you of the final decision within 10 working days of receiving my report."

356.    On November 20, Harrell sent Hutton and Sexton a message with Harrell's post-hearing written defense pleadings, as Sexton requested in Fact 350.

357.    On November 21, Gunner sent Harrell an email that said, referring to Harrell's November 20 message, "my statement (below) about us - SCED - adding this to the Hearing Officer's Binder means the Hearing Officer, Victoria, will consider it as evidence as she privately considers the information presented."

358.    On November 30, Harrell sent another email, arguing that further evidence should be included in the administrative record.

359.    Gunner responded, "Thank you for your e-mail. We will add it to the Hearing Officer's Hearing Binder as well as your file."

360.    In the November 20 and November 30 messages, Harrell complained (Due Process Violation 5) that they had been denied due process during the Hearing because they were denied the opportunity to cross examine Hutton. Harrell pointed out that this denial undermined defendants' claims (CSU Executive Order 1098 (III)(D)(2)) that the hearing was intended to be educational rather than adversarial. After all, Harrell

reasoned, one of the most important aspects of education is the ability to ask questions to the educator.

361.    In the November 20 and November 30 messages, Harrell complained (Due Process Violation 6) that they had been denied due process during the Hearing because Sexton's decision to recognize the Hutton in a position of guidance and greater understanding during the hearing (Fact 320) permanently damaged Sexton's ability to serve as a neutral hearing officer. Harrell cited and quoted Nightlife Partners, Ltd. v. City of Beverly Hills, 133 Cal. Rptr. 2d 234 and explained, "Note that in Nightlife Partners, the key quote that the court cited in recognizing that the petitioners were denied a fair hearing was when the hearing officer in that case said, 'Seated next to me is Assistant City Attorney, Terence Boga, [who] will be advising me and assisting me as necessary in these proceedings.' (The court noted that Boga had also advocated on behalf of one of the parties during that proceeding.) [. . .] California's Second District Court of Appeals found in Nightlife Partners regarding the hearing officer who had heard that case, that 'his role as a neutral arbitrator has been compromised in a manner which, practically speaking, cannot be undone.' That hearing officer committed nearly identical indiscretions to Victoria [Sexton]."

362.    In the November 20 and November 30 messages, Harrell complained (Due Process Violation 7) that they had been denied due process during the Hearing because Sexton refused to exercise her discretion to issue certain rulings because of her erroneous belief that she did not have such power. Harrell noted that in Belridge Farms v. Agricultural Labor Relations Bd., 580 P. 2d 665, the California Supreme Court had decided, "In California mandamus is available to compel an official to exercise his discretion when his refusal is based on an erroneous view of the power vested in him." Harrell continued, "This refusal deprived me of a fair hearing. Accordingly, in this case, a writ of mandate (mandamus) could be used to compel the University to grant a rehearing, in which the court would command the hearing officer to exercise her discretion in the areas where she is actually granted such discretion by law. Furthermore, as I noted during

the hearing under my Standard of Interpretation: de novo header, the Hearing Officer has even more of a constitutional responsibility to exercise discretion than EO 1098 acknowledges."

363.    On December 2, Harrell sent specific quotes with specific timestamps from the hearing recording, which Harrell had not collected before Harrell's November 30 message.

364.    Gunner apparently objected to the inclusion of this email in the administrative record. However, Harrell's December 2 email contained no new evidence, and only contained quotes and timestamps from the hearing recording, that thus should have already been included in the hearing record.

365.    On December 7, Harrell realized that according to Sexton's promise in Fact 355, Sexton should have sent her report to Day by December 6 at the latest. Harrell called Day's office and spoke with Day's assistant Teri Tanner. Tanner told Harrell that she believed that rather than scouring the entire administrative record, Day would probably only consider the Hearing Officer's report before making a final decision.

366.    On December 7, at 11:56 am, Harrell sent an email to Day, to Day's VPSA office mailbox, to Gunner, and to SCED, and requested, "Thus, it is critical that I should be allowed to review the Hearing Officer's report before the VPSA makes a final decision, so that I can identify any incorrect facts and findings, or anything that was in the hearing record but was incorrectly omitted from the Hearing Officer's report, and so that I can bring these concerns to the VPSA." Harrell asserted a due process claim to this report.

367.    Gunner rejected this request in an email at 1:12 pm. Gunner said that Harrell would be able to make a request to review their file after December 16.

368.    Harrell replied at 2:35 pm, asserting that their claim was a valid FERPA request per 20 U.S. Code § 1232g(a)(1)(A) and (d) and (a)(2). Harrell shared that this request was particularly urgent, because Day's decision was quickly coming, and that Day had no choice but to ignore Gunner's objections and comply with the valid request.

369.    On December 8, Harrell visited Tanner at Day's office. Harrell asked Tanner if her office had received the Hearing Officer's report. Tanner falsely stated that she was not under privilege to reveal that information. Harrell told Tanner that under the FERPA sections that Harrell had shared in their previous email, the University must always respond to a FERPA request, either by allowing the student to review the requested documents, by challenging in good faith the validity of the request, or by denying that the document exists in the student file. told me that she believed it would be best for me to contact SCED regarding this. Harrell told Tanner that this put them in a situation of confusion where they were not sure whether Day had actually delegated such responsibilities to SCED. Tanner clarified that this was her personal position, and she could not confirm whether Day held this position. Tanner told Harrell that they should simply wait for the hearing process to conclude. Harrell responded that Day should respond to Harrell's valid FERPA requests before making a final decision. After expressing to Teri Harrell's frustration over the many times when SCED has similarly ignored Harrell's valid concerns, Harrell left the VPSA office.

370.    Harrell then went to the SCED office. Only Angel was there. Harrell asked Angel whether SCED had received the Hearing Officer's report. Angel referred most of my concerns to Gunner, but Angel confirmed that the studentconduct@sjsu.edu email address had not received any such Hearing Officer's report. A few minutes later, Harrell ran into Gunner as she was approaching the Administration Building. Harrell asked Gunner whether her office had received the Hearing Officer's report. Gunner responded that her office had not received this.

371.    Harrell next returned to the VPSA office. Harrell told Tanner that Gunner had just told me that Gunner's office did not have the Hearing Officer's report. Harrell asked Tanner if she disagreed, but Tanner did not respond. Thus, Harrell told Tanner that Harrell believed that it was impossible for Harrell to engage any further with SCED since they denied having the Hearing Officer's report, and Harrell told Tanner that Harrell believed that the responsibility for complying with this FERPA request rested entirely

with Day. Tanner referred back to Gunner's comments about how the Hearing Officer's report would be available in Harrell's file after Day issued a final decision. Harrell reminded Tanner that Gunner's position was a violation of FERPA, and then Harrell left Gunner's office.

372.    Harrell documented these December 8 conversations (Facts 369-371) in an email to Day, to Day's VPSA office mailbox, to Gunner, and to SCED on December 8 at 10:41 am.

373.    The only recipient who responded was Gunner. On December 21, Gunner stated that she refused to send copies to Harrell, and refused to allow Harrell to view the report until January 9. Even then, Gunner only proposed allowing Harrell to view the report on a Zoom call, without allowing Harrell to copy the report.

374.    On December 16 at 5:00 pm, Day sent Harrell a Notice of Hearing Outcome. The letter stated, "I write to inform you of the action San José State University is taking in the disposition of the Hearing that occurred on November 18, 2022, at 3:00pm pst, in via Zoom. After reviewing Victoria Sexton's Hearing Officer report, I have rendered a final decision regarding the Hearing. **Charges** I am imposing the Hearing Officer's recommendation, the greater weight of evidence is that you violated the Student Conduct Code. You have been found responsible for violating the following sections of the Student Conduct Code: (2) Unauthorized entry into, presence in, use of, or misuse of University property. (16) Violation of any published University policy, rule, regulation or presidential order. (18) Any act chargeable as a violation of a federal, state, or local law that poses a substantial threat to the safety or well being of members of the University community, to property within the University community or poses a significant threat of disruption or interference with University operations. **Sanctions** I am adopting different sanctions in my capacity as the President's designee. The following sanctions are imposed on you: Warning. You were informed of San José State University's policies and procedures. You have been placed on notice and are expected to adhere to the behavioral expectations of the University. Additional violation(s) of the Student Conduct Code may

result in further discipline as described in California State University Executive Order 1098 up to and including disciplinary probation, suspension, and/or expulsion. This decision is final; there is no further right of appeal. If you have questions about the procedures set forth in California State University Executive Order 1098, please direct them to Alex D. Froehlich, Director of Student Conduct and Ethical Development or Staci D. Gunner, Interim Director of Student Conduct and Ethical Development. Thank you."

**FIRST CAUSE OF ACTION: CONVERSION**

**Against Defendants Sanchez-Ortega, Khanaka, Bravo, Villavelasquez-Hill, SJSU, and CSU**

375.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

376.    On April 20, 2022, Plaintiff Harrell owned a page of exam notes containing physics and engineering equations, and claimed it as their rightful personal property.

377.    On April 20, 2022, Defendants substantially interfered with Harrell's property by knowingly and intentionally refusing to return Harrell's page of exam notes after Harrell demanded its return.

378.    Harrell did not consent, but instead continued to demand the return of the page of notes.

379.    Harrell was harmed.

380.    Defendants' conduct was a substantial factor in causing harm to Harrell.

**SECOND CAUSE OF ACTION: DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS OF LAW**

**Against Defendants Sanchez-Ortega, Khanaka, Bravo, Villavelasquez-Hill, SJSU, and CSU**

381.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

382.    On April 20, 2022, Defendants intentionally deprived Harrell of Harrell's page of exam notes without due process of law.

383.    Defendants were acting or purporting to act in the performance of their official duties.

384.    Defendants' conduct violated Harrell's right against deprivation of property without due process of law (US Constitution, Amendment 14) (California Constitution, Article I, Section 7).

385.    Defendants acted in accordance with official policies and/or customs of their government employers. These policies and/or customs demanded that Defendants violate the civil rights of CSU students, including Harrell.

386.    The AEC, SJSU, and CSU never had a training program that was adequate to train AEC staff about students' property rights.

387.    It should have been obvious to the AEC, SJSU, and CSU, that this lack of training would result in AEC staff violating students' property rights.

388.    This failure to provide adequate training caused the deprivation of Harrell's right against deprivation of property without due process of law.

389.    Harrell was harmed.

390.    Defendants' conduct was a substantial factor in causing Harrell's harm.

### **THIRD CAUSE OF ACTION: DISCRIMINATION BASED ON DISABILITY**

**Against Defendants Sanchez-Ortega, Khanaka, Bravo, Villavelasquez-Hill, Hutton, SJSU, and CSU**

391.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

392.    Defendants knew that Harrell is an individual with a disability.

393.    Defendants are public entities and their employees.

394.    Defendants provide the service of academic testing at SJSU.

395.    Students who do not have a disability typically take their exams directly with professors.

396.    Based on a reasonable presumption of innocence, professors at SJSU do not commit theft against students or violate the rights of students who are not disabled who take their exams directly with professors. Furthermore, Harrell has observed professors to always respect the property rights of students at all times, including during exams.

397.    Defendants intentionally committed theft against Harrell and intentionally violated Harrell's right against deprivation of property, and justified their actions by pointing to AEC policies that only apply to people with disabilities who take their exams at the AEC testing center.

398.    Defendants committed theft against Harrell and violated Harrell's right against deprivation of property because Harrell was an individual with a disability.

399.    This theft and deprivation of property at the AEC Testing Center effectively prevented Harrell from accessing testing services in a manner that is equal to that afforded students without a disability.

400.    Defendants aided and perpetuated the discrimination perpetrated by other defendants, and provided significant assistance to other defendants who had discriminated against Harrell on the basis of Harrell's disability.

401.    Defendants were acting or purporting to act in the performance of their official duties.

402.    Defendants violated Harrell's right to the equal protection of the laws (US Constitution, Amendment 14, Section 1) (California Constitution, Article I, Section 7).

403.    Defendants violated the Americans with Disabilities Act in 42 USC §12132, which reads, "Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

404.    Harrell was harmed.

405.    Defendants' conduct was a substantial factor in causing Harrell's harm.

406.    42 USC §12133 allows private citizens to enforce this section through a civil claim for money damages.

## FOURTH CAUSE OF ACTION: RETALIATION AGAINST FIRST AMENDMENT PROTECTED ACTIVITY

**Against Defendants Sanchez-Ortega, Khanaka, Bravo, Villavelasquez-Hill, Hutton, SJSU, and CSU**

407.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

408.    Harrell engaged in activity that was protected by the guarantees of freedom of speech and the right to petition the government for a redress of grievances, found in the First Amendment of the United States Constitution. This activity includes but may not be limited to the following:

a.    On April 20, 2022, Harrell objected to the AEC Staff theft of Harrell's exam notes and demanded that AEC staff return the notes.

b.    On April 28, 2022, Harrell met with AEC Director Ignacia Villavelasquez-Hill and objected to the illegal actions of AEC Staff.

c.    On May 15, 2022, Harrell filed a report of discrimination and retaliation against AEC Staff.

409.    Defendants retaliated through actions that include but may not be limited to the following:

a.    Defendants Sanchez-Ortega, Khanaka, Bravo, and Villavelasquez-Hill retaliated against Harrell by seeking student discipline proceedings against Harrell for Harrell's protected activity.

b.    Defendant Hutton retaliated against Harrell by pursuing student conduct charges against Harrell for Harrell's protected activity, and summoning Harrell to a conference.

410.    Harrell's constitutionally protected activity was a substantial or motivating factor for Defendants' retaliatory acts.

411.    Defendants' retaliatory acts would likely have deterred a reasonable person from engaging in protected activity, such as speaking out against illegal conduct by University staff.

412.    Harrell was harmed by Defendants' conduct.

### FIFTH CAUSE OF ACTION: RETALIATION AGAINST OPPOSITION TO UNLAWFUL ACTIVITY

**Against Defendants Sanchez-Ortega, Khanaka, Bravo, Villavelasquez-Hill, Hutton, SJSU, and CSU**

413.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

414.    Harrell opposed illegal action that violated, at minimum, 42 USC §12132.

415.    Defendants took adverse actions against Harrell because Harrell opposed this illegal action.

416.    Defendants violated 42 U.S. Code § 12203(a), which reads, "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."

417.    42 U.S. Code § 12202 allows private citizens to enforce this section through a civil claim for money damages.

### SIXTH CAUSE OF ACTION: WRONGFUL USE OF ADMINISTRATIVE PROCEEDINGS

**Against Defendants Sanchez-Ortega, Khanaka, Bravo, Villavelasquez-Hill, SJSU, and CSU**

418.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

419.    Defendants were actively involved in bringing a student conduct proceeding against Harrell at the SJSU Office of Student Conduct and Ethical Development (SCED) during May 2022.

420.    SCED did not conduct an independent investigation, instead merely relying on the statements, hearsay, and testimony of defendants.

421.    The proceeding ended in Harrell's favor on May 23, 2022, when SCED ended the proceedings without declaring, even to its low standard of preponderance of evidence, that Harrell had violated any of the policy sections with which Harrell was charged.

422.    No reasonable person in defendants' circumstances would have believed that there were reasonable grounds to bring the proceeding against plaintiff.

423.    Defendants acted primarily for a purpose or purposes other than succeeding on the merits of the claim. In particular, defendants acted out of a desire to retaliate against Harrell after Harrell brought accusations of misconduct against Defendants.

424.    Harrell was harmed.

425.    Defendants' conduct was a substantial factor in causing Harrell's harm.

### SEVENTH CAUSE OF ACTION: UNLAWFUL ARREST BY PEACE OFFICER WITHOUT WARRANT

#### Against Defendants Lee and Zonsius

426.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

427.    On June 3, 2022, defendants arrested Harrell without a warrant and without probable cause.

428.    Defendants were acting or purporting to act in the performance of their official duties.

429.    Defendants violated Harrell's rights against unreasonable search and seizure (US Constitution, Amendment 4).

430.    Harrell was harmed.

431.    Defendants' conduct was a substantial factor in causing Harrell's harm.

**EIGHTH CAUSE OF ACTION: UNREASONABLE SEARCH AND SEIZURE**

**Against Defendants Lee and Zonsius**

432.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

433.    On June 3, 2022, defendants searched and seized Harrell's belongings.

434.    Defendants did not have a warrant.

435.    Defendants were acting or purporting to act in the performance of their official duties.

436.    Harrell did not consent to this search and seizure.

437.    Defendants' search was not incident to a lawful arrest.

438.    Even if the search had been conducted as part of a lawful arrest, defendants' search far exceeded what would have been made reasonable by any justified concerns, such as preventing Harrell from gaining possession to a weapon or destroying or concealing evidence.

439.    Harrell was harmed.

440.    Defendants' unlawful search and seizure was a substantial factor in causing Harrell's harm.

**NINTH CAUSE OF ACTION: FAILURE TO ENCOURAGE EDUCATION BY SUITABLE MEANS**

**Against Defendants Hutton, Day, Lee, Zonsius, SJSU, and CSU**

441.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

442.    Defendants created a policy that allows all SJSU staff to use their key cards to enter certain buildings at all times of day and night. This includes athletics staff and event staff whose roles are not academic, and who have no practical need to enter most of these buildings.

443.    However, defendants created a policy that prevents SJSU students from using their key cards to enter the same buildings at the same times, despite the fact that students typically have a far greater need to use the same buildings to study at night.

444.    The SJSU building access policy mentions that students may enter a locked building after hours or on weekends if they have written authorization from faculty or staff. Unfortunately, Harrell's repeated requests for such authorization fell on the deaf ears of defendants who found it more convenient to seek unfounded charges against Harrell than to encourage Harrell's education.

445.    Article IV, Section 1 of the California Constitution commands, "A general diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement."

446.    The state supreme Court recognized that the state constitution (Article I, Section 26) creates a private right of action for declaratory relief or injunction (Katzberg v. Regents of University of Cal., 58 P. 3d 339).

## TENTH CAUSE OF ACTION: DENIAL OF RIGHT TO ATTEND SAFE, SECURE, AND PEACEFUL CAMPUS

### Against all Defendants

447.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

448.    Plaintiff is a student at SJSU, a campus of CSU, a public University in California.

449.    While Plaintiff was attending the campus of SJSU, Defendants subjected Plaintiff to conditions that were not safe, secure, or peaceful.

450.    The state supreme Court recognized that the state constitution (Article I, Section 26) creates a private right of action for declaratory relief or injunction (Katzberg v. Regents of University of Cal., 58 P. 3d 339).

## ELEVENTH CAUSE OF ACTION: DENIAL OF EQUAL PROTECTION OF THE LAW

**Against all Defendants**

451.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

452.    Defendants intentionally treated Plaintiff adversely because Plaintiff is a disabled student.

453.    Defendants intentionally treated Plaintiff adversely, without a legitimate governmental purpose, because Plaintiff is a student at SJSU and not a staff member.

454.    Defendants were acting or purporting to act in the performance of their official duties.

455.    Defendant's Conduct violated Plaintiff's right to equal protection of the laws.

456.    Plaintiff was harmed.

457.    Defendants' conduct was a substantial factor in causing Plaintiff's harm.

## TWELFTH CAUSE OF ACTION: BREACH OF CONTRACT

### Against Defendants Day, SJSU, and CSU

458.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

459.    Plaintiff and Defendants entered into certain contracts:

   a.   On August 14, 2020, CSU most recently revised Executive Order 1098, regarding student conduct procedures.

   b.   On March 12, 2012, SJSU President Mohammad H. Qayoumi released Revised Presidential Directive 2008-02, which contains the following promise: "Institutional Policy for the access and control of information contained in student records operates, at the minimum, in compliance with the SJSU Academic Senate Policy S66-20 Confidentiality of Student Records as well as state and federal statutes, including, but not limited to the federal Family Education Rights and Privacy Act (FERPA)." FERPA, encoded as 20 U.S.C. § 1232g, contains the following provisions:

1.   (a)(1)(A) grants parents the right to inspect and review the educational records of children. (d) grants to adult students all rights over their records that were previously held by their parents.

2.   (a)(2) grants students "an opportunity for a hearing by such agency or institution, in accordance with regulations of the Secretary, to challenge the content of such student's education records, in order to insure that the records are not inaccurate, misleading, or otherwise in violation of the privacy rights of students, and to provide an opportunity for the correction or deletion of any such inaccurate, misleading or otherwise inappropriate data contained therein and to insert into such records a written explanation of the parents respecting the content of such records."

    c. On August 24, 2021, CSU enacted Executive Order 1096 and 1097, together referred to as the Nondiscrimination Policy. This policy was in effect during the relevant portions of the complaint, before it was superseded effective January 1, 2023.

    d. On May 5, 2022, Defendant Hutton on behalf of SCED promised that Harrell would have the opportunity to request a hearing if Harrell disagreed with SCED's findings of violations.

    e. Plaintiff voluntarily entered into all of these contracts, either by explicitly agreeing to their terms, or by implicitly agreeing to them by becoming and remaining a student at SJSU and CSU.

460.   Plaintiff did all, or substantially all, of the significant things that the contract required them to do.

461.   Defendants violated the terms of the contracts by failing to do what the contracts required them to do, and by doing what the contracts prohibited them from doing.

462.   Harrell was harmed.

463.   Defendants' breach of contract was a substantial factor in causing Harrell's harm.

## THIRTEENTH CAUSE OF ACTION: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### Against all Defendants

464.    Plaintiff incorporates herein by reference every allegation in this complaint as though fully set forth herein.

465.    Defendants engaged in outrageous conduct.

466.    Defendants abused their positions of authority that gave them real and/or apparent power to affect Harrell's interests.

467.    Defendants knew that Harrell was particularly vulnerable to emotional distress.

468.    Defendants knew, or should have known, that their conduct would likely result in harm due to mental distress.

469.    Defendants knew that their conduct was not privileged, and that their conduct violated community standards.

470.    Defendants intended to cause Harrell emotional distress, and/or acted with reckless disregard of the probability that Harrell would suffer emotional distress.

471.    Harrell suffered severe emotional distress.

472.    Defendants' conduct was a substantial factor in causing Harrell's severe emotional distress.

VII.    **PRAYER FOR RELIEF**

473.    Plaintiff prays to this Court for relief. Plaintiff prays that this Court:

a.    Enjoin enforcement of Cal. Code Regs. Tit. 5, § 41301(b)(2), requiring CSU to either repeal it or amend it with a policy that is not vague or overbroad, and accords all CSU students with their rights to procedural and substantive due process by specifying, in terms that a person of reasonable intelligence can understand, what types of entry, presence, use, or misuse are unauthorized (Smith v. Sheeter (1975), 402 F. Supp. 624)

b.    Enjoin enforcement of Cal. Code Regs. Tit. 5, § 41301(b)(18), requiring CSU to either repeal it or amend it with a policy that accords all CSU students with their

rights to procedural and substantive due process by making it clear that CSU does not reserve broad jurisdiction over actions that are not actually violations of law. This can be done by amending this section to remove the words "act chargeable as a".

c.  Enjoin enforcement of CSU Executive Order 1098(II)(E), requiring CSU to either repeal it or amend it with a policy that makes it clear that in order to grant all CSU students their right to procedural due process:

1.  if the student challenges the University's interpretations of EO 1098, the Hearing Officer must rule on whether the challenged interpretations are reasonable, (Doe v. Regents of University of California (2016), 5 Cal. App. 5th 1055, citing Berman v. Regents of University of California (2014) 229 Cal.App.4th 1265), and

2.  if the student presents reasonable interpretations of the Student Conduct Code, or of the rules, regulations, presidential orders, laws, or policies that are the subject of the charges, the Hearing Officer must favor the student's reasonable interpretations over the University's conflicting reasonable interpretations (Giaccio v. Pennsylvania (1966), 382 US 399).

d.  Declare that in student conduct proceedings, procedural due process requires (Goldberg v. Kelly, 397 U.S. 254 (1970)) that in a Notice of Conference and a Notice of Hearing, the University must also inform the student of all rules, regulations, presidential orders, or laws that are the subject of the charges. This declaration can be recognized by amending Executive Order 1098 (III)(B)(2)(a) to add "rules, regulations, presidential orders, laws, and" after the word "other", and by amending (III)(C)(3)(a) in the exact same way.

e.  Declare that SJSU and CSU failed to find a preponderance of evidence that Plaintiff violated any section of the Student Code of Conduct in the case they initiated against Plaintiff on May 5, 2022, stylized as Case Number 2021465501. Because this case implicated Plaintiff's Constitutional rights, Plaintiff pleads that

this court should exercise jurisdiction over all questions of fact, procedure, and law.

f.   Order that SJSU and CSU retract the warning that they issued to Plaintiff on May 23, 2022.

g.   Order that SJSU and CSU provide Plaintiff with a fair hearing in Case Number 2021465501, if this Court does not grant relief prayed in VII.473.e and VII.473.f.

h.   Declare that SJSU and CSU failed to find a preponderance of evidence that Harrell violated any section of the Student Code of Conduct in the case they initiated against Plaintiff on June 6, 2022, stylized as Case Number 2021553701. Because this case implicated Plaintiff's Constitutional rights, Plaintiff pleads that this court should exercise jurisdiction over all questions of fact, procedure, and law.

i.   Order that SJSU and CSU retract the warning that they issued to Plaintiff on December 16, 2022.

j.   Order that SJSU and CSU provide Plaintiff with a fair rehearing with a different Hearing Officer in Case Number 2021553701, if this Court does not grant relief prayed in VII.473.h and VII.473.i.

k.   Order that defendants Day, Hutton, SJSU, and/or CSU send Harrell an electronic or paper copy of the Hearing Officer's Report, instead of merely allowing Harrell to view it at inconvenient times with unnecessary restrictions.

l.   Declare that students in an educational testing environment maintain their property rights, including the right to receive one's personal property back upon request, and that no administrative regulation, including a legitimate and enforceable regulation allowing the institution to pursue disciplinary charges against the student based on the student's failure to turn in their personal property, can supersede a student's basic property rights.

m.   Declare that if CSU or any of its campuses designate building spaces on CSU property so that all staff, regardless of work assignment, can enter and remain in

those spaces without additional authorization, then the CSU must also allow all its students, without additional authorization, to enter and remain in those same building spaces for the purpose of study under the same terms and hours by which all staff are allowed to enter.

n.  Declare that except in case of emergency or in the case of a prior lawful exclusion order, if a police officer otherwise has reasonable suspicion or probable cause that a student or staff of a public primary, elementary, junior high, senior high school, community college, college, or university has committed an offense only by entering, remaining in, or refusing to leave the facilities of their own educational institution, if the surrounding circumstances would indicate to a reasonable person that the student or staff member is there for the purpose of otherwise lawful educational activities, then Article X, Section 1 and Article I, Section 28(f)(1) of the California Constitution require that the officer must first offer to escort the student or staff member to an alternate indoor location that is adequate for the student or staff member to resume their educational activities, before the police officer may cite, arrest, or detain the student or staff member, and the police officer may only arrest or detain the student or staff member if they refuse the police officer's offer for an escort.

o.  Declare that based on Defendants' contractual obligations, and based on CSU students' right to procedural due process, CSU and SJSU must send a copy of the Hearing Officer's report to the student charged at the same time that the Hearing Officer sends the written report to the president's designee, and if the student objects to the content of the Hearing Officer's report, the student must be granted a hearing on those objections before the person who makes the final decision on the Hearing Officer's report.

p.  Declare that both CSU Executive Order (III)(D)(7) and the student's right to due process allow the hearing officer to terminate a hearing in the interests of justice.

q.  Declare that both the educational nature of hearings promised in CSU Executive Order (III)(D)(2) and the student's interest in due process grants the student a right to cross examine (or ask questions to) the Student Conduct Administrator regarding the complaint, the charges, and the investigation.

r.  Order appropriate academic relief.

s.  Order injunctive relief, restitution, disgorgement, and/or other appropriate relief.

t.  Award compensatory, punitive, exemplary, and other recoverable damages.

u.  Award reasonable attorney's fees and expenses, if applicable.

v.  Award pre-judgment and post-judgment interest.

w.  Award all other relief that this Court deems just and proper.

VIII.  **JURY DEMAND**

474.  Plaintiff demands a trial by jury of all issues that are triable by jury.

JOSHUA HARRELL          2/28/2023

2/28/2023